UNIVERSAL OIL PRODUCTS COMPANY, Plaintiff, *v.* SHELL DEVELOPMENT COMPANY et al., Defendants.

Supreme Court, Special Term, New York County, October 6, 1949.

*Timothy N. Pfeiffer* and *Rebecca M. Cutler* for plaintiff.

*William Dwight Whitney* and *William F. Collins* for Shell Development Company, defendant.

*Ralph M. Carson* and *William R. Meagher* for Standard Oil Development Company, defendant.

*E. F. Liebrecht* for The M. W. Kellogg Company, defendant.

ISIDOR WASSERVOGEL, Official Referee. The issue to be determined in this action is whether World War II has ended insofar as the agreement between the parties here involved is concerned.

Plaintiff, a Delaware corporation, seeks a declaratory judgment as to the meaning of the phrase " six months after the termination of the present war " contained in an agreement to which it and all of the defendants in this action are signatories. The action was discontinued by stipulation as to two of the contracting parties, namely Texaco Development Corporation and International Catalytic Oil Processes Corporation, upon their consent to abide by the judgment rendered herein. Anglo-

Iranian Oil Company, Limited, although not within the jurisdiction of this court, has agreed to submit to its judgment in consideration of plaintiff's covenant not to sue the corporation in England on the subject matter of this suit.

The agreement here involved, known as "Recommendation 41 Agreement," is dated August 7, 1942, although it is conceded that it was not executed until on or about April 19, 1944. Plaintiff contends that the time denoted by the phrase "six months after the termination of the present war" has not yet arrived and will not be reached until the making of a formal treaty of peace with Germany and Japan, or until a proclamation is made by the President of the United States that the war has ended. The defendants, Standard Oil Development Company (hereinafter referred to as "Jersey") and Shell Development Company (hereinafter referred to as "Shell") contend that the war ended, for purposes of the agreement, on or before July 25, 1947.

Pursuant to a Presidential letter, dated May 28, 1941, to the Secretary of the Interior, Recommendation No. 41 was issued by the Office of Petroleum Coordinator for War, later known as Petroleum Administration for War. It recommended, among other things, that various companies in the oil industry, including the parties involved in this action, negotiate an arrangement whereby they would mutually assist each other and carry on research and development work in oil refining processes. The agreement involved herein is the result of the attempt of the parties litigant to comply with this Recommendation No. 41.

The agreement executed by the parties provides for the exchange of technical information among them and establishes a licensing and cross-licensing arrangement with respect to certain methods and processes for catalytic refining of petroleum. For this purpose each of the parties to the agreement is licensed by all the other parties. Plaintiff and defendant, The M. W. Kellogg Company, which has assumed a neutral position in the dispute before the court, are granted nonexclusive rights to issue licenses under the patent rights of the signatories to the agreement. They are required to grant licenses thereunder to all applicants therefor, substantially as set forth in a form of license annexed to the agreement and made a part thereof.

Approximately twenty licenses have been granted to petroleum refiners and are now outstanding under the agreement. The date of "termination of the present war," as defined in the agreement and licenses granted thereunder, is a crucial date

because a lapse of six months from the time when the war terminates cuts off certain phases of performance under the contract. Among the obligations of the parties which would come to an end at the expiration of six months after the termination of the war are the necessity for co-operative research and the exchange of laboratory and technical data. The obligation of the parties to furnish improvements and developments to licensees pursuant to licenses outstanding under the agreement would also then be ended. The date when the war terminates fixes the latest conception date of inventions by the parties and their licensees, upon which patents are to be licensed and cross-licensed as provided for in the agreement. Determination of this date constitutes one of three conditions upon which is based the licensees' right to terminate outstanding licenses and also ends the period of reduced royalty rates on products of the licensed processes sold to the United States Government and its agencies. Although the termination of the war would serve as a cut-off date to end the flow of new information or patents based thereon under the licensing provisions of the agreement, it merely determines the extent of patents which plaintiff and defendant Kellogg may license, and does not mark the end of their licensing rights, which would continue thereafter for the life of the patents.

By the terms of the agreement, the laws of the State of New York control its construction. The legality of the arrangement established by the parties is not an issue before the court and will not be considered.

I hold that, under the laws of this State, the intentions of the parties at the time of the execution of the agreement are of the essence and must be ascertained. It, therefore, becomes necessary to examine the circumstances surrounding the agreement entered into by the parties in order to determine the meaning of the phrase, " termination of the present war " (*Matter of Jones* v. *Schneer*, 270 App. Div. 1027; *Galbord* v. *Buono*, 188 Misc. 324).

The record before me clearly indicates that throughout the negotiations preceding the adoption of the Recommendation 41 Agreement, all of the parties and the various Government agencies interested in this problem considered the proposed arrangement as a means of furthering the war effort during the national emergency. It was undoubtedly an exigency requisite to the prosecution of the war. The parties to the agreement are all members of a highly competitive industry.

The Pearl Harbor disaster, however, and the ensuing world conflict made the mobilization of private industry for the production of essential materials a vital factor in the prosecution of the war. In view of the nature of the emergency, competition among the oil companies was temporarily suspended. In the early part of 1942, the companies here involved already had started discussions with officials of the Petroleum Coordinator for National Defense in an attempt to draft a recommendation to be issued by the Office of the Petroleum Coordinator (Hearings of Senate Committee on Patents, 77th Cong., 2d Sess., part 8, p. 4174). But the policy of the Department of Justice to prosecute associated companies as violators of the antitrust laws hampered the formulation of an agreement whereby the signatories thereto could safely combine their patent rights and processes in the catalytic oil refining industry. Jersey had previously been enjoined by a decree of a District Court of the United States from participating in any catalytic refining association. In order to allay the fears of those engaged in industry, the Attorney General, by letter dated April 29, 1941, announced that thereafter the policy of the Department of Justice would be to immunize from prosecution under the antitrust laws any acts performed by business men in compliance with specific requests made by agencies of the Government for the purpose of " a maximum productive effort in the national defense," as required " in the present emergency ". This letter of the Attorney General merely outlined an informal administrative procedure for securing antitrust clearance from the Department of Justice, but, in the light of the injunction issued against Jersey (U. S. Dist. Ct. of New Jersey, March 25, 1942) and the decisions of the Supreme Court of the United States (*United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150, 225; *Standard Oil Co.* v. *United States*, 283 U. S. 163), which held that informal approval by Federal officers of co-operative arrangements would not be adequate to obtain immunity from prosecution, the parties involved felt that this assurance of immunity was an insufficient guarantee to enable them to enter into an arrangement such as the Recommendation 41 Agreement. Subsequently, on June 11, 1942, section 12 of Public Law 603 (77th Cong., 2d Sess.) was enacted by Congress, which provided a statutory basis for the suspension of the antitrust laws during the national emergency. Thereafter, on July 24, 1942, Recommendation No. 41 was issued by the Petroleum Coordinator for War, followed on August 7, 1942, by the certification of the Chairman of the War Produc-

tion Board to the Attorney General that the combination of the parties, as proposed in the Recommendation was "requisite to the prosecution of the war " (War Production Board Certificate No. 9; 7 Federal Register 6278).

In adopting the Recommendation 41 Agreement, the parties thereto contracted that the phrase under consideration should refer to the same time as that referred to by the same phrase in section 12 of Public Law No. 603, 77th Congress, and in the Recommendation No. 41 of the Petroleum Coordinator for War. The context in which the phrase was used in the Recommendation No. 41 is as follows: "The terms and conditions in any license * * * shall not provide any royalty rate in excess of that approved * * * with respect to all products produced and sold, prior to the expiration of *six months after the termination of the present war,* to the Government of the United States * * *." Section 12 of Public Law No. 603 contains the phrase in the following provision: "This section shall remain in force until *six months after the termination of the present war* or until such earlier time as the Congress by concurrent resolution or the President may designate, * * *." (Italics supplied.)

A study of the legislative history of the Senate bill, into which section 12 was incorporated (Senate No. 2250), indicates that the phrase "termination of the present war" was used solely to enhance and promote mobilization and use of the facilities of business in the war production effort. This purpose is evident in the address by Senator Murray, in charge of its passage in the Senate. He stated: "We are engaged in a battle of production; and the main purpose and hope of the pending bill is to utilize the productive capacity of the country by bringing into production as promptly as possible all the capacity of the small plants of the Nation." (88 Cong. Record, part 3, p. 3245, March 31, 1942.)

With respect to the termination amendment to the proposed bill, which was originally suggested by the Acting Secretaries of the Navy and Army and the Chairman of the War Production Board, its sponsors gave the following explanation: "The proposed bill is not a blanket suspension of the anti-trust laws, nor does it envisage their repeal. *It would apply solely to measures required in the interests of war production,* the Chairman of the War Productions Board to have the right to withdraw his direction at any time the necessity therefor ceases. By its terms the statute would expire at the end of the war, after a six-months' period given for demobilization of industry back

into peace-time channels of free competition. Likewise the bill provides that the President, or Congress by concurrent resolution, may terminate the statute at an earlier date."

In the debate on the bill in the House of Representatives, Congressman Summers, Chairman of the House Judiciary Committee, submitted an amendment to the proposed House bill, to provide for termination of the antitrust immunity section of the bill which was ultimately enacted. He explained that: " Ordinarily the Committee on the Judiciary would have contested the jurisdiction of section 11 [which provided for antitrust exemption] of this measure, but *on account of the war situation* my colleagues and myself on this committee do not feel we want to raise that question. We feel that this amendment would help straighten matters out and any further difficulties would be straightened out in the conference between the House and the Senate or in future legislation." (Italics supplied.) (88 Cong. Record, part 4, p. 4531, May 25, 1942.)

In the conference committee, section 12 was drafted in the form in which it was enacted, effecting a compromise between the Senate and House, whereby the Chairman of the War Production Board was required to consult with the Attorney General, but could grant immunity without being subject to his veto.

In the light of this legislative history of the act, and particularly the provisions relating to the suspension of the antitrust laws, it is evident that at least the members of Congress contemplated that the phrase " six months after termination of the present war " was used with relation to the emergency period of war production.

Likewise the phrase "termination of the present war," as used in Recommendation No. 41 of the Petroleum Coordinator for War, referred merely to the petroleum industries' wartime program. The purpose of the issuance of the recommendation is clearly explained in an official communication by the Petroleum Administrator to the War Production Board. He explained that Recommendation No. 41 would enable the parties thereto to " satisfy the requirements of our armed forces and those of our allies," and would " make these (catalytic refining processes) and related processes available to the petroleum industry for the *manufacture of war products* \* \* \*."

The Recommendation also enables the Chairman of the War Production Board to certify the action of the parties as " *requisite to the prosecution of the war* " under section 12 of Public Law 603. (Italics supplied.) Further evidence that this was intended as a wartime measure is shown by the fact that

the parties to the agreement acquiesced in the reduction of royalties upon catalytic refining processes used in connection with the " *war program*," and provided in the agreement itself that they would not fix royalties in excess of those approved by the Coordinator with respect to products sold to the Government " prior to the expiration of six months after the termination of the present war ".

Throughout the entire negotiations surrounding the agreement entered into by the parties, they, as well as various Governmental agencies involved, continually were aware of the fact that the possibility of adopting and entering into such an agreement was made possible only as a result of the necessity of furthering the war effort. The intention of the parties in entering into the Recommendation No. 41 Agreement appears in a letter dated July 14, 1943, from Mr. R. J. Deerborn, president of Texaco Development Corporation, to Mr. J. Howard Marshall, Chief Counsel for Petroleum Administration for War, in which Mr. Deerborn stated: " Accordingly, it is believed by these companies that, in order fully to develop and bring to their maximum utility and efficiency  *  *  *  and to accomplish the development of  *  *  *  processes within this field which may become  *  *  *  of vital importance in the war effort, the parties should continue their cooperative research and development work within the field of catalytic refining *for the duration of the war*  *  *  *." All of the parties to the agreement were cognizant of the attitude of the Department of Justice. They knew that their arrangement presented serious problems after the war emergency was over. This was made clear to them by Hon. Tom C. Clark, then Assistant Attorney General, who, on July 13, 1943, wrote to the chief counsel for the Petroleum Administration for War with regard to the proposed Recommendation 41 Agreement. Mr. Clark stated:

" It is my understanding that the agreements contemplate activities and operations that will continue beyond the end of the war emergency. For example, I understand that licenses issued during the war emergency will continue for the lives of the patents involved and also that any applicants after the war emergency will be licensed under the collective patent rights in the same manner as during the war emeregency. I understand further that the agreements relate to licenses under the patents involved for use within defined fields.

" As you know, the effect of a certificate issued under Section 12 of Public Law 603 will grant immunity to those participating in the approved arrangement from prosecution under the anti-

trust laws during the period that the certificate is in effect. Consequently, as to operations under the proposed agreements *after termination of the war emergency*, the disability as to the anti-trust laws will be removed.

" Consequently, the proposed agreements may present serious problems under the anti-trust laws after the war emergency. In view of this and upon the assumption that the Chairman of the War Production Board will issue a certificate approving these agreements, the Department of Justice, of course, reserves complete freedom to enforce the anti-trust laws after the period Section 12 is in effect   *   *   *.  I wish to make it very clear that any action pursuant to the aforesaid certificate will not in any manner affect or prejudice this department in the invocation or enforcement of the anti-trust statutes, if applicable, with respect to these agreements or other understanding of the parties when the period covered by the certificates expires."

All of the parties to the Recommendation 41 Agreement received copies of this letter. In addition to this announcement of the intentions of the Department of Justice, the Attorney General, by letter dated April 18, 1944, wrote to the Chairman of the War Production Board:

" I acknowledge that the finding and certification were made after consultation with me, as required by Section 12 of Public Law 603.

" I note that you have stated that nothing in your approval is to be construed as authorizing or requiring the doing of any act or thing or the omission to do any act or thing in violation of the anti-trust laws of the United States or the Federal Trade Commission Act *after the termination of the present war and an additional period of six months thereafter.*"

" The Department, of course, will continue to insist on full compliance with the decrees entered in the matter of United States v. Standard Oil Company   *   *   *."

It is fundamental that public policy underlying the antitrust laws requires their speedy reinstatement upon the termination of the emergency giving rise to their temporary suspension (*United States* v. *Association of American Railroads*, 4 F. R. D. 510; *United States* v. *Borden Co.*, 308 U. S. 188, 198; *United States Alkali Assn.* v. *United States*, 325 U. S. 196, 205-206). The parties to the Recommendation 41 Agreement, represented by able counsel throughout the negotiations, must have been aware of this limitation. Likewise, the parties themselves had all the expressions and opinions of the various Government agencies and officials hereinabove referred to before them at the time

the agreement was signed. All the parties to the agreement took an active part in the negotiations in which many Government agencies were involved. They were, or must be deemed to have been, well aware of the military and political background at the time the agreement was entered into. Regardless of how certain in their own minds they might have been and still are concerning the propriety and legality of the Recommendation 41 Agreement, once the express prohibition against antitrust action was removed, the certainty of immunity from prosecution was never assured. In view of this, and the other surrounding circumstances above mentioned, I hold that it was for this period of guaranteed freedom from suit, synonymous with the war emergency itself, for which the parties contracted in fixing the cut off date in the agreement by use of the phrase " termination of the war ".

Plaintiff's counsel has argued at length that the phrase " termination of the present war " is a term of art, with a technical and well-defined meaning establishing that a war does not end until a treaty of peace has been signed or at least until the political branch of the Government has formally declared that the war is over. The court holds to the contrary. In support of its contention, plaintiff has cited a number of United States Supreme Court cases, but has placed special emphasis upon *United States* v. *Anderson* (9 Wall. [U. S.] 56), *Hamilton* v. *Kentucky Distilleries Co.* (251 U. S. 146), *Ludecke* v. *Watkins* (335 U. S. 160), and the New York case of *Malbone Garage* v. *Minkin* (272 App. Div. 109). With the exception of the New York case, which will be dealt with separately, none of the cases relied on by plaintiff has any application to the question presented here. Plaintiff has failed to cite any case involving a private contract in which a court has construed a disputed phrase as a term of art and has refused to consider evidence of the intention of the parties to the contract. In the two contract cases brought to the attention of the court by plaintiff (*Woods* v. *Miller,* 333 U. S. 138; *Fleming* v. *Mohawk Co.,* 331 U. S. 111), the phrase " termination of the war " was not part of the litigation at all. Likewise, in the *Ludecke* case (*supra*), which involved an alien enemy, the so-called term of art played no part in the action. The phrase involved in *Hamilton* v. *Kentucky Distilleries Co.* (*supra*), which concerned the Wartime Prohibition Act, was " until the conclusion of the present war and thereafter until the termination of demobilization ". The issue in the *Hamilton* case is clearly distinguishable from that in the instant action. In *United States* v. *Anderson* (*supra*), an early

Civil War case involving the Abandoned or Captured Property Act of 1863, the alleged term of art was " after the suppression of the rebellion ". It is evident that the case is not applicable here.

As to the *Malbone Garage* case (*supra*), cited by plaintiff, an examination of the opinion of the Appellate Division indicates that it does not support plaintiff's contention. The court stated (pp. 111–112): " *The question is one of intent. If the parties intended that their words should be given their proper legal significance, the order appealed from should be affirmed. On the other hand, if by ' After the termination of the war ', they meant ' after the cessation of actual hostilities ', effect must be given to that meaning. No evidence was offered on trial as to negotiations or discussions which would shed light on the meaning which the parties intended, and we must determine the question on consideration of the instrument itself, the evidence adduced as to the circumstances surrounding its execution, and the purposes which the parties sought to accomplish.*" (Italics supplied.)

It is important to note that the court in the *Malbone Garage* case points out that " No evidence was offered on trial as to negotiations or discussions which would shed light * * * " on the intentions of the parties. That is the crux of the situation which distinguishes such case from the instant action. Here, the record is replete with documents evidencing the intentions of the parties and the discussions and circumstances surrounding the execution of the Recommendation 41 Agreement. A proper interpretation of the *Malbone Garage* case leads to the conclusion that the intentions of the parties, if properly adduced upon the trial, will be fully considered and applied in construing a contract which turns upon the meaning of a phrase contained therein (*Utica City Nat. Bank* v. *Gunn*, 222 N. Y. 204; *Rasmussen* v. *New York Life Ins. Co.*, 267 N. Y. 129, 132). A court of equity, in its interpretation of a particular phrase, should not be bound by the confines of a dictionary, where the definition of a word or phrase, though it be technical in fact, would frustrate the intent and purpose of the parties (*Cabell* v. *Markham*, 148 F. 2d 737, 739).

The court is well aware that, as plaintiff points out, the phrase involved in this action is inextricably tied in with the Federal statute to which the Recommendation 41 Agreement refers. Federal statutes are construed according to the intent of Congress in enacting them. This does not necessarily mean that the intention of the Legislature is to be gleaned by a strict

reading of the statute, or by reference to a single phrase. A proper interpretation requires an adherence to a plain, common sense meaning of the language contained in the statute, rather than an application of refined and technical rules of grammatical construction (*Heydenfeldt* v. *Daney Gold & Silver Mining Co.,* 93 U. S. 634). As stated by Mr. Justice DOUGLAS in *Markham* v. *Cabell* (326 U. S. 404, 409), '' The policy as well as the letter of the law is a guide to decision. Resort to the policy of the law may be had to ameliorate its seeming harshness or to qualify its apparent [absoluteness] as *Holy Trinity Church* v. *United States,* 143 U. S. 457 illustrates. The process of interpretation also misses its high function if a strict reading of a law results in the emasculation or deletion of a provision which a less literal reading would preserve.''

In the *Holy Trinity Church* case cited by Mr. Justice DOUGLAS (*supra,* p. 459), the court held: '' It is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers. This has been often asserted, and the reports are full of cases illustrating its application. This is not the substitution of the will of the judge for that of the legislator, for frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act.''

And, as observed by Mr. Justice HOLMES in *Towne* v. *Eisner* (245 U. S. 418, 425) : '' A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it was used.''

It thus becomes necessary, in order to ascertain the meaning and relationship between the phrase here involved and the Federal statute to which it refers, to examine the legislative history of the statute and the intentions of Congress in enacting this law.

As already stated, the effective period of the Recommendation 41 Agreement was to be determined with reference to the limitations set forth in both Recommendation No. 41 and Public Law No. 603. With the end of the war in the Pacific Theater in August, 1945, it became apparent that the needs of the emergency period were waning and that the country was anxious to return

to a peacetime schedule. To reach that goal, various emergency measures and wartime Government agencies were terminated. On September 13, 1945, Recommendation No. 41 was revoked as of October 15, 1945. The certificates of the War Production Board were also revoked as of October 15, 1945. Thereafter on May 3, 1946, Executive Order No. 9718 terminated the Petroleum Administration for War (11 Federal Register 4965). On December 31, 1946, the President formally declared the cessation of hostilities. The President explained that concurrent with such declaration the Government's power under various war emergency statutes came to an end (Proclamation 2714, 12 Federal Register 1, 1947).

It is conceded that the revocation of the War Production Board certificates, the revocation of Recommendation No. 41 and the termination of the Petroleum Administration for War do not mark the termination of the war for the purposes of the agreement between the parties. A legislative declaration of the termination of the war for certain purposes was, however, effected by a joint resolution of Congress, which, among other things, repealed Public Law No. 603 (Public Law No. 239, 80th Cong., 1st Sess.). The resolution became law when it was signed by the President on July 25, 1947.

Public Law No. 239 does not contain any formal declaration of termination of the war. By its terms, fifty-seven statutory provisions were immediately repealed; sixteen additional statutes were amended so as to establish a terminal date, and more than one hundred other statutory powers were suspended, although they were to remain as permanent legislation for use upon the occurrence of certain contingencies. The Senate Judiciary Committee's Report fully set forth the purpose of the bill which repealed or provided for the termination of so many emergency statutes, as follows:

" On the basis of all the information developed as a result of the foregoing procedure, the committee has concluded that while it is necessary to continue in effect a number of war and emergency statutory provisions, a large number of such provisions should now be repealed or operations thereunder terminated. Senate Joint Resolution 123 as introduced on June 5, 1947, was prepared primarily for the purpose of establishing a basis upon which the committee might found its final conclusions.

" The committee recommends that the termination of war and emergency statutory provisions should be made in positive terms. Accordingly, the resolution in the amended form

reported out by the committee provides specifically for the repeal or other termination of the provisions of law granting war or emergency powers which should be terminated at this time. In this form the resolution leaves no doubt as to its exact operation." (Report of Sen. Comm. on Judiciary, 80th Cong., 1st Sess., June 23, 1947, Sen. Report No. 339).

The Senate Report goes on to explain the difference of treatment between the temporary and permanent legislation. The temporary provisions were to be repealed immediately. The permanent provisions were to remain on the statute books for use in some future contingency. This was done by declaring a termination of the war upon which the *operative effect* but not the existence of the permanent legislation depended. The difference of treatment is thus explained in the Senate Judiciary Committee's Report:

" Section 1 of the resolution would accomplish the immediate repeal of 60 statutory provisions, which include the bulk of all the temporary statutes enacted since the beginning of World War II.

" Section 2 amends 16 additional statutory provisions so as to effect their repeal at a fixed time in the future which will permit a necessary period for conversion to peacetime operations. The termination provisions in these statutes would no longer be related to a war or emergency, but the statutes would be amended so that they would expire on the dates provided in the resolution.

" Section 3 of the resolution, which lists 108 statutory provisions, provides that in the interpretation of these provisions the time when the resolution becomes effective shall be deemed to be the date of the termination of any state of war heretofore declared by the Congress and of the national emergencies proclaimed by the President on September 8, 1939, and on May 27, 1941. Nearly all of the provisions affected by this section are permanent legislation. Most of them are effective only during the periods of war or emergency. A few provide that the statutory authority will continue for a specified period after the termination of war or an emergency. The section will have the effect of terminating immediately operations under the statutory provisions which are in effect only during a period of war or emergency. Authority under provisions which by their terms remain in effect for a specified period after the termination of the war or emergency will terminate at the end of that specified period. The Permanent statutes affected by the section will

remain as permanent legislation for use again upon the occurrence of the contingency provided for by their terms.'' (Sen. Report No. 339.)

Section 12 of Public Law 603, the enabling statute referred to by the Recommendation 41 Agreement and which permitted the parties to enter into such agreement with immunity from prosecution under the antitrust laws, was one of the fifty-seven temporary measures immediately repealed by section I of Public Law No. 239. In placing section 12 in the category of temporary statutes, Congress was, in effect, returning the petroleum industry to its normal peacetime competitive basis. As stated by Senator McGrath:

'' The purpose of the bill, as drawn, is to place the country generally back on a peacetime basis with respect to many of the functions that have been heretofore exercised on a wartime or emergency basis. * * * the measure we are asking the Senate to pass have been thoroughly studied, and we believe it to be the most orderly way possible to largely return the Government to a peacetime basis.'' (93 Cong. Record, part 6, p. 7585, 80th Cong., 1st Sess., June 24, 1947.)

In explaining the repeal of section 12 of Public Law No. 603, Senate Report No. 339 (Judiciary, subd. 3, trade and commerce) states: '' The resolution has the effect of repealing this provision immediately, except that outstanding certificates issued thereunder are permitted to continue in effect for a period of 6 months from the date of the approval of the resolution unless sooner revoked. It is the view of the committee that the period of 6 months provided for the continuance of outstanding certificates is sufficient to permit arrangements to comply with the antitrust laws and the Federal Trade Commission Act in all cases, and the committee feels that all such outstanding certificates should be terminated by administrative action as soon as possible within the 6-month period.''

It is evident, therefore, that Congress regarded section 12 as a temporary emergency measure. Otherwise this statute would have been placed under section 3 of Public Law No. 239. As the intention and effect of Public Law No. 239 was to restore the country to its normal peacetime basis by terminating the many temporary laws in effect since the beginning of World War II, Congress, in enacting the joint resolution (Public Law No. 239), determined that, for the purpose of the statutes which were thereby repealed, the war had ended. There can be no doubt that at the time section 12 was repealed the emergency necessitating its enactment had passed. The prior dissolution

of the Petroleum Administration for War made it virtually impossible for the parties, within the terms of the agreement, to devise or change forms of licenses approved for existing processes, or to amend royalty rates previously established. The abolition of the War Production Board had done away with the authority of the certifying official designated in section 12. Thus prosecution of the war to its successful conclusion, insofar as section 12 was concerned had been achieved.

The court has hereinabove determined that it was the intention of the parties that the Recommendation 41 Agreement was to remain in effect during the period of the war emergency. It has been conceded that the agreement must be construed in the light of the limitations set forth in the Federal statute referred to therein (Public Law 603, § 12). I hold, therefore, that the repeal of such statute by Congress on July 25, 1947 (Public Law No. 239), was a legislative edict proclaiming the termination of the present war, which is binding upon the signatories of the Recommendation 41 Agreement.

Plaintiff's assertion that the parties continued to carry out phases of the contract after January 25, 1948, is not borne out by the evidence adduced at the trial. Nothing in the record indicates that any of the parties to the agreement continued to distribute any technical information developed or acquired after the cut-off date. Under the provisions of the agreement, the parties thereto were entitled to an exchange of information and developments acquired up to the date which terminated their arrangement. Such an exchange might occur after the cut-off date, provided, however, that the information passed on related to processes *acquired before* the termination of the agreement, viz., six months after the termination of the war. Plaintiff has failed to show that it knew of any patent with a conception date after January 25, 1948, with respect to which the parties continued to distribute information. The mere act, therefore, of transmitting any new development or technical information to the licensees after January 25, 1948, would not be sufficient to sustain the contention of continued performance.

Judgment may be entered which shall declare that, for all purposes of the Recommendation 41 Agreement, the date of the termination of the present war was the effective date of the repeal of section 12 of Public Law No. 603 of the 77th Congress, viz., July 25, 1947, and that the six-months period following such " termination of the present war," as used in the Recommendation 41 Agreement and related documents, ended January 25, 1948.

Submit decree within ten days on three days' notice.

The foregoing are the facts found by me and constitute the decision of the court as required by section 440 of the Civil Practice Act.