Harold Hyman, J.
Man’s inventive genius and explorations in the twentieth century have brought forth many innovations; and now, one of the most sensational of all such — one which if allowable must join the ranks of the great — is how to gamble at Las Vegas, or some other such place which permite gambling, losing money in and to their palatial casinos, without it costing the loser anything. The theory presented is an interesting and novel one; made more so in that it has not been conceived by any mathematical genius, but rather by a member of the Bar.
In that vein, the court will address itself to defendant’s motion to dismiss the complaint pursuant to CPLR 3211 (subd [a], par 7) and plaintiff’s cross motion for summary judgment (CPLR 3212); the facts are as follows.
Plaintiff alleges that on or about April 2, 1973 and prior thereto, he maintained several checking accounts with defendant bank and that on or about the above date (actually March 30, 1973, three days earlier) he entered into an "agreement” or "condition of the account”, a "contract” with defendant, wherein defendant agreed not to make payments drawn on plaintiff’s checking accounts unless the instrument being presented for payment was on "printed checks of the bank”, but that in September, 1975 (two and one-half years later) the defendant violated such alleged "agreement-contract”, without plaintiff’s permission and paid out of his checking account the sum of $1,000 "on instruments which were not on the printed *166 check forms of defendant bank”; thus causing the plaintiff $1,000 in damages.
Plaintiff asserts the same facts as a second cause of action, except charging defendant with negligence by reason of defendant’s violation of the agreement, thus allegedly causing the plaintiff damages of $1,000,000.
Plaintiff also asserts a third cause of action, claiming that at the time of the "agreement” (contract), he relied upon defendant’s oral and written representations that "defendant would carry out its obligations under said agreement” (contract), but that defendant bank fraudulently made such representations knowing that it would not do so, to his damage, and that defendant’s failure to comply with the "agreement” (contract) was willful, deliberate and malicious; to plaintiff’s damage in the sum of $1,000,000.
In the moving papers on his cross motion, plaintiff asserts that the agreement was an "agreement or condition of the account”, which he asserts to be permissible pursuant to section 4-103 of the Uniform Commercial Code as a "variation by agreement”; he also asserts that the bank’s negligence could not be waived by him (Uniform Commercial Code, § 4-103, subd [1]).
Plaintiff further asserts in his cross-moving papers that the so-called "oral agreement” with defendant arose from his having had a dispute with a hotel in Puerto Rico, which refused to honor certain (unnamed) commitments to its gambling patrons and which eventually went bankrupt; that because of that incident he decided "to stop any attempt by any hotel to avoid its commitments”. He therefore explained to defendant’s alleged agent his desire to protect himself from any repetition of such occurrence and that said agent suggested that he put his "instructions in writing and agreed to the restrictions on his account”.
The documentary proof indicates that on March 30, 1973 the plaintiff did put his instructions into "written” form and forwarded same, to defendant; and such instructions were acknowledged to have been "received” by defendant in April, 1973. The instructions read as follows:
"In accordance with your request for written authorization, I wish to advise you not to pay any instruments drawn on the above accounts unless they are printed checks from your bank. * * *
*167 "Yours very truly,
"/s/ Irving P. Dinerman "Received by National Bank of North America this day of April, 1973
"By: [signature unreadable] 4/2/73”
(Emphasis supplied.)
Having left the tables of the Puerto Rican casinos, plaintiff apparently decided to try his luck at the casino tables of the hotels in Las Vegas, Nevada. This he did in August, 1975, some two years and four months after his so-called prior written instructions. But, to his consternation, he was no better at the tables in his new found gambling haven than he had been at the former palaces of delight, nor, he contends, was his luck any better with the Las Vegas hotel as with the Puerto Rican hotel, insofar as their so-called agreements were concerned, because he did not obtain an "off-set” for airfare and other adjustments (also unnamed) from the Las Vegas hotel at whose tables he gambled but lost $1,000, for which he executed two so-called "markers” (actually printed checks) which read substantially as follows:
"To Natl. Bk. of N. America
911324983
Customers Check 31502
(For Cash Only)
Your Account Number N.Y.C. N.Y.
Date 8-15-1975
City and State
PAY TO THE ORDER OF Sahara Hotel
Five Hundred .............................. $500.00

I represent that I have received cash for the above amount and that said amount is on deposit in said bank or trust company in my name, is free from claims and is subject to this check.

Signed: IrvingP. Dinerman”
(Emphasis supplied.)
Except for the fact that the second "check” (marker) bore number 29871, they both were dated the same date, drawn upon the same bank with the same numbered account, and were for the same amount.
Plaintiff contends that the afore-mentioned document, with its title "Customer’s Check” (printed in heavy black bold type Vgtin of an inch in height as to each letter), in actuality is not *168 what it purports to be, but that each is only a mere indicia of an amount of chips taken and that no cash is ever taken; these "markers”, he maintains, are to be paid by the maker only after "off-sets” are credited to him against said "marker”, and that they are then, after said "off-sets” are made, returned to the customer. Did he thusly inform the defendant? Did he make known to defendant, in writing, what he has now explained above? The moving papers are devoid of any such contention by plaintiff.
The so-called loss, he maintains, from obtaining his "offsets” is because "it is not feasible for me [him] to sue the hotel in Las Vegas”; that "airfare, stay overs, etc., make it impractical”.
Of course, his complaint is that defendant cleared the two checks and he was therefore deprived from taking his now claimed "off-sets”.
Without going further into defendant’s answer and its legal and factual contentions, or the statutory law involved, it is apparent that even if the court was to assume plaintiff to be correct in all detail and contention, nevertheless (and at most), defendant would be liable to plaintiff only for his actual damage (Uniform Commercial Code, § 4-103, subd [5]), something which he has failed to set forth in his moving papers. He merely sets forth generalities. Based upon such lack of specificity, such cannot be the basis for summary judgment in his behalf, even under CPLR 3212 (subd [c]) because there exists no acceptable proof upon which to allow or base such so-called damage or loss occasioned by uncollected "off-sets”, for they may not be proven against defendant as such is objectionable under the "hearsay evidence” rule; the statute places the burden of proof upon the plaintiff to establish the amount of loss resulting from payment of an item contrary to a so-called pending "stop payment order” (Uniform Commercial Code, § 4-403, subd [5]; American Defense Soc. v Sherman Nat. Bank of N. Y, 225 NY 506; Chase Nat. Bank of City of N. Y. v Battat, 297 NY 185). Here, no claim or inference may be drawn from the pleadings or plaintiff’s papers that defendant had ever been apprised of the details of plaintiff’s arrangements with regard to the Las Vegas venture or that defendant was a party in interest with regard thereto. It clearly and unequivocally appears to the court that the instruments paid out upon by the defendant were signed with the amounts admittedly inserted therein by plaintiff, and that they contain *169 his own "representation” knowingly made by plaintiff that they were executed and delivered by him to the payee "for cash only” and for which he "received cash” in "the above amount”, from which he may not now extricate himself; but that he now wishes to impose upon the defendant the status of a knowledgeable coconspirator, against its will. This he may not do.
The defendant opposes the plaintiff’s cross motion and in support of its primary motion to dismiss the complaint, admits that a customer does have a limited right to issue a "stop payment order” by statutory authority under section 4-403 of the Uniform Commercial Code, which reads as follows:
"(1) A customer may by order to his bank stop payment of any item payable for his account but the order must be received at such time and in such manner as to afford the bank a reasonable opportunity to act on it prior to any action by the bank with respect to the item described in section 4-303.
"(2) An oral order is binding upon the bank only for fourteen calendar days unless confirmed in writing within that period. A written order is effective for only six months unless renewed in writing.
"(3) The burden of establishing the fact and amount of loss resulting from the payment of an item contrary to a pending stop payment order is on the customer.” (Emphasis supplied.)
As stated in the Official Comment (Official Comment 7, McKinney’s Cons Laws of NY, Book 62 1/2, Uniform Commercial Code, § 4-403, p 612): "The existing statutes all specify a time limit after which any direction to stop payment becomes ineffective unless it is renewed in writing; and the majority of them have specified six months. The purpose of the provision is, of course, to facilitate stopping payments by clearing the records of the drawee of accumulated unrevoked stop orders, as where the drawer has * * * settled his controversy with the payee, but has failed to notify the drawee.” (Emphasis supplied.)
In the instant matter the bank merely acknowledged "receipt” of the written request (stop payment order) on April 2, 1973; as such it cannot be legally interpreted as a general, unlimited lifetime "agreement”, but at best is a receipt of the notice to stop payment within the purview of section 1-201 (subd [26], par [b]) of the Uniform Commercial Code, which provides that, "A person 'receives’ a notice or notification *170 when * * * it is duly delivered at the place of business * * * [at] the place for receipt of such communications. ” At best it is an acknowledgment of the taking into possession of something, a mere admission of a fact in writing of the receipt of something, without containing any affirmative obligation of creating any contractual obligation, except that in the instant case it would create the statutory obligation under section 4-403 of the Uniform Commercial Code; a far cry from any contractual obligation. But, even if it be considered as an "agreement” (contract), the statutes which existed when it was made must be read into it (City of New York v Interborough R. T. Co., 257 NY 20; Uniform Commercial Code, § 1-201, subd [3]; § 1-103). And, unless a contract specifically provides otherwise, the law in force at the time an agreement is entered into becomes as much a part of the agreement as though it was expressed or referred to therein, and the contract will be construed in light of such law (Kasen v Morrell, 6 AD2d 816; Uniform Commercial Code, § 1-103). It is well settled that laws in force at the time a contract is made govern the obligation incurred under the contract (Weiler v Dry Dock Sav. Inst., 258 App Div 581, mot for lv to app granted 259 App Div 715, app dsmd 283 NY 641, affd 284 NY 630; Uniform Commercial Code, § 1-103), and this also includes any limitations set forth in said statutes (Universal Oil Prods. Co. v Shell Dev. Co., 196 Misc 497, affd 276 App Div 1058, affd 301 NY 649), more particularly so as to direct provisions of a statute (Nieman v Nadelman, 136 Misc 386, affd 229 App Div 865). In any event, this court does not look upon the alleged paper which plaintiff seeks to enforce as a binding, lifetime contract, but rather as a document which does not destroy or change defendant’s existing statutory rights or duties, and as mere evidence of the fact of defendant’s having received said letter. At best, it could create only the statutory obligations and duties imposed and in existence at the time.
In the instant matter, the plaintiff, an attorney learned in the law to an extent far greater than a mere layman, cannot now be permitted to claim a lack of knowledge of the statutory limitation placed upon "stop payment orders”, particularly one "in writing”, beyond a six-month period without written renewal thereof (Uniform Commercial Code, § 4-403, subd [2]). To permit the plaintiff to now claim, as he does, that the stop payment order was to extend beyond the statutory limitation by virtue of an alleged "oral agreement” simultane *171 ously made with the written stop payment order would do violence to the statute, the enacting legislative intent, and to the "depositor’s contract” entered into when opening the account, which provides as follows: "Written request for stop-payment shall be effective for six (6) months, but renewals may be made from time to time. No stop payment request, renewal or revocation shall be valid unless made in writing and served upon the bank.”
Plaintiff’s second cause of action in alleged negligence and his third cause of action for alleged fraud both emanate out of the contract alleged in the first cause of action. In view of the basic contract action herewith being dismissed, the second and third causes of action, which are wholly dependent thereon, must likewise fall. (Brick v Cohn-Hall-Marx Co., 276 NY 259, 263-264; Carnival Co. v Metro-Goldwyn-Mayer, 23 AD2d 75.)
The plaintiff’s cross motion for summary judgment is denied. The defendant’s motion to dismiss the complaint is granted, with $40 costs.