**AMERICAN HERITAGE BANK AND TRUST CO., Plaintiff-Appellant and Cross-Appellee,**

**v.**

**James B. ISAAC and Cash Cattle Company, Defendants-Appellees and Cross-Appellants,**

**and**

**Mike Sadler, Defendant.**

**No. 79CA0826.**

Colorado Court of Appeals,
Div. II.

July 16, 1981.
Rehearing Denied Aug. 27, 1981.
Certiorari Granted Nov. 23, 1981.

Otto K. Hilbert, Colorado Springs, for plaintiff-appellant and cross-appellee.

Isaac, Johnson & Alpern, Howard J. Alpern, Colorado Springs, for defendants-appellees and cross-appellants.

ENOCH, Chief Judge.

Plaintiff, American Heritage Bank & Trust Co., (the bank) and defendant James B. Isaac, individually and doing business as Cash Cattle Co., a partnership, both appeal a judgment in favor of the bank in the amount of $17,764.77. Though judgment was also entered against defendant Mike Sadler, he has not appealed. We affirm in part and reverse in part.

The following facts are not disputed. Defendants Isaac and Sadler formed a partnership under the name of Cash Cattle Co. for the purpose of buying and selling cattle. On June 30, 1977, as partners, they executed a note payable to the bank, for $102,-000. The proceeds of the note were credited to a partnership account in the bank and were to be used by the partnership to buy cattle. The interest rate on the note was 10.5% per annum, with provisions for a rate of 18% in the event of default in payments. The note as originally typed, stated on its face that it was due December 15, 1978. The "8" in the year 1978 was, however, penciled over and a "7" was placed under the "8". A stamp stating that the note was due on January 29, 1978, was placed on the reverse side of the note, and that entry was signed by Sadler.

On March 10, 1978, in the name of the partnership, Isaac and Sadler executed a second note to the bank in the amount of $59,510.06. This note was due on March 25, 1978, and bore the same interest rates as the first note. At the time of trial, bank records showed that there was a principal amount of $22,754.84 owed on the first note, plus 18% interest from January 29, 1978. The balance on the second note was $58,-543.20, plus 18% interest from March 26, 1978.

Sadler authorized all transactions of the partnership in purchasing and selling cattle, and Isaac received the monthly bank statements of the partnership account. At the time the account was opened, the authorization, signed by both Isaac and Sadler, allowed the bank to "accept and pay . . . drafts drawn upon bank accounts . . . *standing in the name of* said co-partnership . . . ." (emphasis added) The authorization was to remain in effect unless amended in writing by both partners. The name of the partnership set forth on the authorization was "Cash Cattle Co.," and any endorsements of drafts on the account required the authorization of only one of the partners.

On or about January 30, 1978, two drafts were debited to the account of Cash Cattle Co., but the drafts were drawn on "Cash Cattle Co. Inc." Two more drafts drawn on "Cash Cattle Co. Inc." were debited to the partnership account on or about February 27, 1978. The four drafts totalled $85,-430.30, and each draft contained a description of the cattle purchased by that draft. The bank called Sadler for approval on each draft before payment.

On June 9, 1978, the bank filed suit against the partnership and the partners individually for the principal amount owed on both notes, interest, and attorney fees. Sadler did not enter an appearance. Isaac pled as a counterclaim and as an affirmative defense that the bank negligently debited the partnership account for the four drafts drawn on "Cash Cattle Co. Inc." The trial court found that the bank was negligent in debiting the partnership account for the amount of the four drafts, that the partnership did not receive the cattle represented by the four drafts, and that Sadler used the proceeds of the four drafts for his own purposes. The court entered a default judgment against Sadler for the full amount of $103,195.07, representing principal and interest on the two notes, and $6,600 in attorney fees. It also found Isaac liable for the principal and interest due, but it awarded Isaac a setoff in the amount of $85,430.30, (total of the four drafts), and entered judgment against Isaac for $17,764.77. The judgment was joint and several as to the first $17,764.77.

## I.

The bank contends that Isaac should have been held liable for the amount of the four drafts drawn on "Cash Cattle Co. Inc." and therefore should not have been allowed a setoff for this amount. We agree.

The bank claims that it was not negligent in debiting the partnership account for the four drafts. Alternatively, it claims that if it was negligent, Isaac was contributorily negligent, or that the bank's negligence was not a proximate cause of any damage to Isaac.

An appellate court cannot substitute itself as the finder of fact, and fact findings of the trial court, sitting without a jury, are not to be disturbed on appeal unless clearly erroneous and not supported by the record. *Page v. Clark*, 197 Colo. 306, 592 P.2d 729 (1979). Here, the trial court found that the bank was negligent in debiting drafts drawn on "Cash Cattle Co. Inc." against Cash Cattle Co. Isaac's expert witness testified that the bank, being obligated per the authorization form to obtain written approval of both partners before approving drafts not issued in the name of the partnership, did not exhibit ordinary care when it approved the drafts drawn on "Cash Cattle Co. Inc." Accordingly, the trial court's findings cannot be said to be clearly erroneous. Because the bank did not exercise ordinary care in approving the four drafts, it is statutorily estopped from asserting that Isaac was contributorily negligent. Section 4–4–406(3), C.R.S.1973.

There is, however, no support in the record for the trial court's finding that the bank's negligence resulted in a loss to Isaac. To have legal consequences, the negligence must have been the proximate cause of the complained of injury, and the burden of proving the causal relation was on Isaac. *See* § 4–4–103(5), C.R.S.1973 (Official Comment 6); *see also W. Prosser, Torts* § 41–42 (4th ed. 1971); *Marcoux v. Van Wyk*, 572 F.2d 651 (8th Cir. 1978); *Brickell v. First National Bank*, 373 So.2d 1013 (Miss.1979); *Dinerman v. National Bank of North America*, 89 Misc.2d 164, 390 N.Y.S.2d 1002 (1977). Though Isaac testified that the partnership was missing 180 head of cattle and that the approximate worth of those cattle was near the amount represented by the four drafts, he presented no evidence of a causal connection between that loss and the negligence of the bank.

The partnership records in Isaac's possession showed that during the time of the partnership operation the partnership purchased a total of 4,445 cattle and sold 4,265. It was from this final accounting that Isaac was able to determine that 180 cattle were not accounted for. There was no evidence as to what happened to the missing cattle or when they disappeared. Many of the transactions were only on paper, and it is apparent that the partnership seldom took actual possession of any cattle. Isaac's own testimony was that he could not determine whether the missing cattle were those represented by the four drafts.

In any event, it is undisputed that the four drafts indicate that a total of 321 head of cattle, rather than 180, were purchased by the drafts, and records in Isaac's possession showed that all 321 cattle were invoiced to the partnership. It is therefore immaterial that the 180 missing cattle may have been part of the 321 purchased by the four drafts. Therefore, the evidence does not support the trial court's findings that the partnership did not receive the cattle represented by the four drafts and that Sadler used the proceeds of these drafts for his own purpose. Because the partnership was credited with 321 cattle, any loss must be attributed to problems within the partnership, and cannot be considered a result of the negligence of the bank. There being no evidence establishing causation, the trial court's finding that Isaac's loss was a proximate result of the bank's negligence was erroneous.

## II.

Isaac contends that the due date on the first note was December 15, 1978, and that the interest should not be calculated at a default rate until that time. We disagree.

Testimony from Sadler's deposition, read into evidence at trial, without objection, was that the intent of the parties was that the note was due December 15, 1977, and that the original note showing a due date of December 15, 1978, was a typographical error. Sadler further testified that the bank extended the due date of the first note to January 29, 1978, and the trial court so held. Although the court did, as Isaac alleges, support its finding on other evidence which it had previously ruled as inadmissible, Sadler's testimony is sufficient to support the trial court's findings, and we are bound by its determination of the due date.

Inasmuch as we have determined that there should not have been a setoff against the amount due the bank, the issues raised concerning whether interest should have been computed before or after the setoff have become moot.

### III.

We find no merit in Isaac's contention that the court erred in its award of attorney fees. The record indicates that these fees were stipulated to by the bank and Isaac. Therefore, Isaac may not now successfully seek to adjust that figure. We also find no merit in Isaac's other arguments.

The judgment is affirmed against defendant Isaac as to attorney fees and $17,764.77, and that part of the judgment reducing defendant Isaac's liability by the amount of the four drafts is reversed, and the cause is remanded to the trial court for entry of a judgment consistent with this opinion.

KIRSHBAUM, J., concurs.

BERMAN, J., dissents.

BERMAN, Judge, dissenting.

Respectfully, I dissent.

I would affirm the judgment of the trial court, but upon a different concept of the case than that under which the trial court proceeded, and upon which the majority premises its decision to reverse.

1. §§ 4–1–101 to 4–11–102, C.R.S.1973.

In my view, the rights and duties of the parties to this litigation are not to be determined by general negligence principles. *See G & R Corp. v. American Security & Trust Co.*, 523 F.2d 1164 (D.C.Cir.1975). Instead, specific provisions of the Uniform Commercial Code,[1] or, in their absence, general contract principles govern. *G & R Corp., supra.*

Section 4–4–401(1), C.R.S.1973, provides in part that "[a]s against its customer, a bank may charge against his account any item which is ... *properly payable* from that account ...." (emphasis added) By negative implication, a bank may *not* charge against its customer's account any item which is *not* "properly payable" therefrom. *G & R Corp., supra; Ford Motor Credit Co. v. United Services Automobile Ass'n v. Chase Manhattan Bank (N.A.) v. Chemical Bank New York Trust Co.*, 11 U.C.C.Reptr. 361 (N.Y.Civ.Ct., 1972); *Mortimer Agency, Inc. v. Underwriters Trust Co.*, 73 Misc.2d 970, 341 N.Y.S.2d 75 (1973); *W. R. Grimshaw Co. v. First Nat. Bank & Trust Co. of Tulsa*, 18 U.C.C.Reptr. 734 (Okla.App., 1976), reversed on other grounds, 563 P.2d 117 (Okla.1977); *Cincinnati Ins. Co. v. First Nat. Bank of Akron*, 63 Ohio St.2d 220, 407 N.E.2d 519 (1980); *J. White & R. Summers, Uniform Commercial Code* § 17–3.

What is "properly payable" is established by, *inter alia*, the terms of the deposit agreement. *G & R Corp., supra.* Here, the majority upholds the trial court's finding that the bank violated the terms of the deposit contract in debiting the four drafts in issue against the partnership account. Thus, the majority in effect concedes that these drafts were not "properly payable" within the meaning of § 4–4–401(1).

The question, therefore, becomes one of what legal consequences flow from an improper payment. As to that question, Judge Tamm, speaking for the United States Court of Appeals, D.C. Circuit, has observed:

"The U.C.C., by design or oversight, has omitted any specific section granting a customer the right to demand that his bank recredit his account for items improperly paid. The existence of such a right, however, is strongly urged by the negative implications of section 4–401(1) ...."

*G & R Corp., supra; see also J. White & R. Summers* § 17–3, *supra.*

Furthermore, the general common law rule required a bank to recredit its customer's account for any item improperly paid. *Stone & Webster Engineering Corp. v. First Nat. Bank & Trust Co. of Greenfield,* 345 Mass. 1, 184 N.E.2d 358 (1962); *Wiley v. Manufacturers Hanover Trust Co.,* 6 U.C.C. Reptr. 1083 (N.Y.Sup.Ct., 1969); *W. R. Grimshaw, supra; Cincinnati Ins. Co., supra.* Indeed, such was the pre-U.C.C. Colorado rule. *See Denver Electric v. Phipps,* 143 Colo. 530, 354 P.2d 618 (1960).

Thus, § 4–4–401(1) has, by implication (see discussion, *supra* ), merely codified the Colorado and general common law rule. *Stone & Webster Engineering, supra; Wiley, supra; W. R. Grimshaw, supra; Cincinnati Ins. Co., supra; see also* § 4–1–103, C.R.S.1973, and Official Comment 1. thereto. Nor is a contrary interpretation of that section warranted, for, as Judge Tamm has noted, no overriding policy considerations tempt one to supply to banks, in cases such as this, a protection not specifically provided by the drafters of the U.C.C. *See G & R Corp., supra.* Thus, the bank in the instant case should be required to recredit the partnership account in the amount of the drafts here in question. *See G & R Corp., supra; Stone & Webster Engineering, supra; W. R. Grimshaw, supra; Cincinnati Ins. Co., supra; J. White & R. Summers* § 17–3, *supra.*[2]

Because the counterclaim the trial court allowed was, as the majority notes, in the exact amount of the four drafts here involved, the allowance of the counterclaim is equivalent in this case to a recrediting of the partnership account. Since in my opinion such a recrediting (or its equivalent) is required, the allowance of the counterclaim should be affirmed. Given such a result, the bank should be permitted to seek restitution of the amount of these drafts from the payee. In turn, to avoid unjustly enriching the partnership, any legitimate claims of the payee creditor that may have been discharged as a result of the bank's improper payment must be restored as against the partnership. In other words, the partnership should be entitled to view the effect of these drafts as a nullity, and the parties should be restored to the *status quo ante. See Denver Electric, supra.*

At trial, no assertion was made that the partnership later ratified the bank's payment of these drafts. Thus, any question as to ratification may not here be considered. C.R.C.P. 59(f).

The judgment should be affirmed.

---

**2.** *But cf. Middle States Leasing Corp. v. Manufacturers Hanover Trust Co. v. Federal Reserve Bank of New York,* 62 App.Div.2d 273, 404 N.Y.S.2d 846 (1978); *McIsaac v. Bank of New York,* 74 App.Div. 717, 425 N.Y.S.2d 678 (1980).