COMMERCIAL NATIONAL BANK & TRUST CO. OF LAUREL *v.* HUGHES, et al.

No. 42114         February 12, 1962         137 So. 2d 800

*Deavours & Hilbun,* Laurel, for appellant.

254

*Beard, Pack, Ratcliff & Dillard,* Laurel, for appellees.

McELROY, J.

This is an appeal from a final decree of the Chancery Court of the Second Judicial District of Jones County awarding appellees a money judgment for $19,273.84.

Appellees had a checking account in appellant bank. The signature card authorized only them to sign checks on it. In late December 1959, appellees learned that appellant, since July 1954, had been permitting their secretary to sign checks on the account. Of the checks so signed by her, she had made 126 of them payable to herself and had cashed or deposited them to her personal account.

Appellees learned also that appellant, since January 1958, had been permitting her to cash or deposit to her personal account checks payable to them which she was supposed to have deposited to their account. These, 24 in number, totaled more than $2,500.00.

The lower court's decree was rendered on the Special Chancellor's findings of fact, in which he held that the appellant bank was negligent.

The sole decisive issue in this case is whether the appellant Bank was negligent.

This cause, originally filed in the Circuit Court, was transferred to the Chancery Court and the pleadings there recast. Appellees averred in their bill of complaint that they are and have been partners doing business under the name of Hughes & Foote, engaged in activities relating to the development and production of oil, gas and minerals. Several years before 1954 they opened a checking account in the appellant bank in the name of Hughes & Foote, signing at the time the customary signature card which provided that only the appellee Urban B. Hughes or the appellee Alfred Foote was authorized to sign checks on the account. During the period from

July 1, 1954, to December 1959, their sole employee was Frances B. Stringer, who was clerk, stenographer and bookkeeper and whose duties consisted of keeping all of the books and records of the partnership, depositing the partnership's funds to its account and preparing checks to be signed by one or the other of the appellees, and otherwise performing office duties. They averred that she was never expressly or impliedly authorized to sign checks on the partnership's account or to cash checks of other persons which were made payable to the partnership. Nevertheless, around July 1954, Frances Stringer commenced signing checks drawn on the appellees' bank account; and by the end of December 1959 she had drawn checks payable to herself which she had cashed or deposited to her own account in the total amount of $17,392.30.

One Tom McGlothlin, who has shared office space with appellees for many years, each month delivered to the partnership his check for one-third of the office expenses. Though these checks were payable to Hughes & Foote, the appellant bank permitted Mrs. Stringer to cash 24 of them or deposit them to her individual account, in the total amount of $2,715.34. One check in the amount of $22.00 which, on its face, was not signed by anyone, was, nevertheless, paid to Mrs. Stringer.

Appellees averred that prior to July 1954, Frances Stringer had been their employee for years; that they had come to trust her implicitly and delegated to her all of the work incident to the keeping of the books and records of the partnership; and that they did not suspect that there was any irregularity in their bank account until the last days of December 1959. Immediately upon learning of the shortage in their bank account, they notified appellant bank.

Appellant answered, admitting the existence of the bank account, the opening balance as averred by appellees, the amounts of deposits as averred by appellees,

and that there was a balance to the credit of appellees as of December 31, 1959, but denied that the balance in said account was short by the amount of the checks for which appellees sued. Appellant admitted that it had cashed or paid checks drawn on the account and signed by Frances B. Stringer, as averred by the appellees, but alleged that she had been "expressly, orally authorized by Urban B. Hughes and Alfred Foote" and had been "Impliedly authorized" by them to sign checks on the account. It admitted that it had honored and paid the checks exhibited with the bill of complaint and signed "Hughes & Foote by Frances B. Stringer", but denied that such was negligent, careless or unlawful. Appellant admitted that it had cashed or paid the 24 McGlothlin checks to Mrs. Stringer and that they had not been endorsed by either Hughes or Foote, but averred that they had been paid upon the endorsement "by an authorized person and properly presented for payment". It asserted that because it paid value therefor, it became a holder in due course and was not liable. Appellant denied that it did not report to appellees that Mrs. Stringer was signing checks on their account. It averred that appellees knew, or should have known, by reason of the partnership's monthly bank statements. It affirmatively averred that since there was a notation on the form of the monthly statements that, if the depositor made no objection within ten days, the account was finally settled. Appellant affirmatively pleaded that the cause of action was barred as to all items which were more than six months old, then affirmatively pleaded that all items more than five years old were barred. It asserted that appellees themselves had been negligent and were, therefore, precluded from setting up any lack of authority on the part of their secretary to draw on their account or endorse and cash checks payable to the partnership. It averred appellees ought to have known when they hired Frances B. Stringer that her fidelity

was questionable. It averred that for several years prior to 1954 she had been guilty of discrepancies and shortages in handling appellees' affairs, and that appellees should have known it. Appellant averred that but for the negligence of appellees the losses complained of, or a large part thereof, would not have taken place. It then categorically denied that it had been guilty of negligence.

Appellee Hughes' testimony was to the effect that the partnership had employed Frances B. Stringer in November 1946 and that she had remained in their employ until the very last day of December 1959. Her duties were those of typist, receptionist and bookkeeper. They first discovered about January 1, 1960, that some unauthorized checks had been written and others cashed without his or Mr. Foote's endorsement. At the time Mr. Foote was out of town, but immediately upon his return in a day or two they saw their attorney, arranged to have an audit made, and notified the President of the Commercial National Bank & Trust Company. He further testified he had no knowledge of any reputation of Frances B. Stringer for dishonesty before that time. Her normal duties were the examination of the monthly bank statements and keeping the books, writing the checks for their signatures. She had no authority whatever to sign either his name, Hughes, or Mr. Foote's. They considered her a very efficient employee and trusted her implicitly. He had never authorized the bank to pay or cash any checks signed "Hughes & Foote by Frances B. Stringer", or to cash any checks payable to the partnership which they sent her to the bank to deposit. He had never looked at or examined the bank statements; that he relied on Mrs. Stringer to check them, always trusting her honesty. However, there did arise this situation: That not long after Mrs. Stringer entered their employment a question concerning her morality was called to their attention; since she was from

a prominent family, a lot of factors were involved, and they did not want to hurt the girl. They discussed the matter with their wives, and it was concluded under the circumstances they ought not to discharge her. Tom McGlothlin had first started sharing office space with them in January 1948. At the end of each month Mrs. Stringer would add up the office expenses and by pre-arrangement McGlothlin would give her a check payable to Hughes & Foote for one-third of that amount. Mr. Foote signed most of the partnership checks; he signed from time to time when Mr. Foote was not available; such checks as he did not personally sign or endorse he assumed were being signed or endorsed by Mr. Foote. His first knowledge that Mrs. Stringer had not kept any records for the year 1959 was after the shortage came to light. He had never previously examined the partnership books of account, but they were sent by Mrs. Stringer to the auditor's office each year to prepare income tax reports. The partnership received many checks for oil runs which required the personal endorsement of the named payee, even for deposit to their account. He and Mr. Foote would personally endorse these checks before sending them to the bank for deposit. Mr. Foote kept a careful record of the oil run checks which were sent for deposit, and they were all properly deposited to the partnership account. He and Foote agreed at the end of each month how much they would draw from the partnership account, and partnership checks payable to each of them individually were issued and sent to the bank by Mrs. Stringer for deposit to their individual accounts. Mrs. Stringer's salary throughout the period from 1954 to December 31, 1959, was $200.00 a month, which after tax and social security deductions came to about $90.20 for each half month. They always operated by checks. Over a period from July 1954 to December 1959 Mrs. Stringer had signed an average of about 24 checks per year which were in proper payment of part-

nership bills. These checks are not sued on. However, they did not know about this until the last of December 1959. He was positive that each half month a check had been written either by him or his partner to Mrs. Frances Stringer in payment of her salary, but what she did with them he did not know. The first discrepancy which appeared on the partnership's books was back in 1947. He was quite positive that at the time they had employed Mrs. Stringer neither he nor Mr. Foote had any knowledge of a difficulty she had while a high school senior employed as a ticket seller at a local theater.

The testimony of Mr. Foote was to the same effect as Mr. Hughes' in regard to the efficiency of Mrs. Stringer, her duties and their implicit trust in her. He had no knowledge that anything was wrong until December 29, 1959. Mrs. Stringer regularly carried the firm's deposits to the bank. He had never told any officer or employee of the bank that Mrs. Stringer was authorized to sign checks on the partnership account or to endorse and cash checks payable to it. He related a number of positions of civic honor which Mrs. Stringer had held in recent years in which she had been entrusted by others with substantial amounts of money. She was Secretary-Treasurer of possibly two clubs. That prior to the partnership's engaging Mrs. Stringer, Mrs. Foote, his wife, had known her for many years and had recommended her due to her family connection and her personality. He felt that they had sufficient information from his wife and from their knowledge of her family connection to warrant their employing her. He had never examined the partnership bank statements except for the first month or two immediately following her employment. She was instructed to furnish the auditor in Mr. Block's office, the first of each year, such information as he might require in order to prepare income tax returns. In December 1959, after all of this came up, they began to search for the bank statements,

they found them scattered all over the place and it took two days to assemble them. Mrs. Stringer was never instructed that she should endorse checks for deposit. We assumed that the bank was very carefully handling the account. The first checks which she wrote were for legitimate office expenses. On his first visit to the bank after discovering the shortage he had asked to see the signature card to make certain that another signature had not gotten on it that the partnership had not authorized. He stated: "I am firmly satisfied that I signed at least 90 percent of the checks for office expenses, actually signed by me. What happened to them after I signed them I have no knowledge." He did not know that the partnership's books were devoid of any entries for the year 1959 until after F. J. Block & Company made their audit. Mr. Foote had never before seen the checks payable to himself signed by Frances B. Stringer which were deposited to his personal account on her endorsement for deposit. The appellant bank had accepted payment of certain partnership notes owing to it by checks drawn on the partnership account and signed by Mrs. Stringer. She had also assumed to sign checks to the bank in payment of delay rentals on oil leases. He was sure that either he or Mr. Hughes had twice monthly signed and given her a proper salary check in the amount of $90.20. He had on occasions personally authorized the draft clerk at the bank to honor drafts drawn by third parties in payment of oil leases.

The president of the appellant bank testified on its behalf in effect that after the discovery that Mrs. Stringer had been signing checks on Hughes & Foote, he had several conversations with appellees, who had told him that they had so trusted her that neither of them had ever looked at any of their books or bank statements or anything of that kind. It was his recollection that at one of the conferences which he had with them early in 1960 they had told him that they had known of an

incident while she was in high school when some irregularities had appeared at the Strand Theater where she was ticket seller. He outlined the routine in the bank whereby deposits are made, and said that when a bookkeeper, in posting to an individual account, finds any discrepancies in a signature, it would be referred to the person in charge of the bookkeeping department. One Miss Perry was in charge of the bookkeeping department from before 1954 until her death in the latter part of 1959. If a check should come through with an unauthorized signature it would have been her duty to make some inquiry into the matter. He said that for many years the statements which the bank sends monthly to its customers has on the printed form at the bottom a notation: "If no error is reported in 10 days the account will be considered correct. All items are credited subject to final payment."

Appellant's president explained that when a check is offered for deposit to the credit of the named payee who has an account in appellant bank, some notation is usually made on the back of the check to show to whose account such check is credited; that it is not important whether this notation be an actual endorsement by the named payee or whether the named payee's name is written by an employee or whether the teller puts a rubber stamp on it reciting simply that it is to be credited to the account of the within payee. In some instances if a check is tendered to a teller for deposit to the account of the payee, the teller may request the person tendering such check to endorse it or to write the name of the named payee. He stated that simply because a clerk or secretary frequently brings her employer's checks to the bank for deposit to her employer's account and has written on the back of them the name of the employer, the teller should not infer that such employee is authorized to draw on the employer's account. The appellant bank had about seven tellers in 1954, four of

whom are still employed by it; that the tellers in the bank have no responsibility to determine whether the signature on a check is authorized or unauthorized if it is tendered for deposit. From the teller's cage in appellant bank, all checks go to the proof department, but no one in the proof department has any responsibility to examine the signatures of checks. From there they go to the bookkeeping department, where they are allotted to the clerks who keep the individual accounts. Such person is responsible for the determination of whether or not a check is signed by one who is authorized to sign it. The signature cards are kept in the bookkeeping department and the individual bookkeeper is supposed to know the signatures of those customers whose accounts are included in the part of the ledger kept by him. If this individual bookkeeper has any question as to whether a person is authorized to draw on a particular account, he should refer it to the department supervisor. The department supervisor should then telephone the customer and ascertain the facts about the check. If they are not able to communicate with him, they should return the check. Appellant bank keeps two sets of signature cards — one downstairs at the rear of the tellers' cages and one set upstairs in the bookkeeping department. The number of the teller appearing upon a check indicates the teller who has handled it. The president's attention was called to the endorsement, ''All prior endorsements guaranteed'', appearing on many of the checks in evidence, and he stated that all checks coming into his bank are so stamped. When his attention was called to a check which was simply signed, ''Hughes & Foote by————————'', he admitted that it should have been sent back by his bookkeeping department for signature. The honoring of such checks without any signature, he admitted, would simply show that his ''bookkeeper or somebody just wasn't on their toes''. He was then shown another

check without any signature which had been paid and admitted that was another instance where his bookkeeping department slipped up. He admitted that when a check is presented to a teller payable to a person other than the one presenting it, and the one presenting it asked that it be cashed and the cash given to him, the teller should not cash it unless it bears the endorsement of the payee. If a secretary presents a check payable to her employer, asking that it be cashed, when it is endorsed only in the name of the employer by the secretary, "the teller should have referred it to some officer" and the officer should have contacted the employer to determine whether the secretary had authority to endorse her employer's name for the purpose of cashing the check. He admitted the teller should not rely on what the secretary said, because she would not be the principal in the case, and it would be necessary that the principal, i. e., employer, be contacted to ascertain the secretary's authority. He admitted that the same thing would be true if the secretary, instead of asking that the check be cashed, asked that it be credited to her personal account. The president admitted that he had no reason at all ever to think, suspect or conjecture that Frances Stringer might have committed a thing of this sort. He stated when a teller sees a check about whose signature he is doubtful, the teller should refer it to a bank officer. If a check appears to a teller to bear an unauthorized signature, he should refer to the file of signature cards. When a teller cashes a check or credits one to some account other than that of the within named payee, the teller is supposed to make certain of the instrument by reference to the signature card.

The president did not know whether or not any effort had been made to locate the particular bookkeeper who was handling appellees' account in 1954. His tellers and his bookkeeping department should be guided by signature cards and not by inferences. The appellant

represents itself to the public as being extremely careful with its depositors' funds, and has thus enjoyed a phenomenal growth.

Woodie Rogers, for the appellant, testified he is a certified public accountant of many years' experience and a partner in F. J. Block & Company. He annually prepared the partners' tax returns from their books, consisting of their ledger and journal, but saw nothing on the face of the books to indicate that anything was irregular. He did not check the books against the original checks, nor did he make an examination of the bank statements. When he was engaged in January 1960 to make an examination of the partnership's affairs, he went back as far as 1947. He found that no entries for the year 1959 had been made in the journal or ledger. He found a minor discrepancy in the books in June of 1947. The next discrepancy did not appear until two years thereafter. He found that the books, the check stubs and the cancelled checks all differed from each other. He found, in each year from 1954 on, fewer proper payroll checks issued to Frances Stringer and signed either by Foote or Hughes than she was entitled to receive. Occasionally purely fictitious checks were written and at other times checks would be overstated in the books. In addition to checks which had been signed by Mrs. Stringer payable to herself, she had written other checks in payment of legitimate office expenses. It was impossible for him to tell on his yearly examination of the ledger and journal that there were any defalcations going on, as they appeared on the surface to be in perfect order. The only way in which the irregularities could have been discovered was to compare the journal and ledger entries with the actual checks. He customarily examined the partnership's withholding and social security tax reports which were prepared by Mrs. Stringer, and they showed her monthly salary to be $200.00 gross. There was nothing in the journal or

the ledger which he examined each year to indicate to him that Mrs. Stringer was signing checks on the Hughes & Foote account. During the period from July 1, 1954, until December 31, 1959, there were about 850 or 860 partnership checks written in payment of legitimate expenses, and of these approximately 80 percent were signed either by Mr. Hughes or Mr. Foote.

Mrs. Mamie Lou Hemington testified for appellant she was employed for the past eleven years by appellant as its collections and exchange teller. She was shown Exhibits 26 and 27 to the cross examination of Mr. Foote. These are copies of drafts on which she had made a notation that they were approved by Mr. Foote by phone by Frances Stringer. She explained that as a matter of fact she didn't just ask Mrs. Stringer whether she should pay the drafts, but mailed a notice to Hughes & Foote, and Mrs. Stringer subsequently phoned her and said that Mr. Foote said to charge the drafts to the Hughes & Foote account. She understood that she was carrying out the instruction of Mr. Foote and was not honoring the drafts merely on the authority of Mrs. Stringer, who she considered was simply communicating over the telephone the instruction given the bank by Mr. Foote.

From the above testimony as outlined the learned special chancellor's finding of fact was to the effect that long prior to July 1, 1954, the partnership of Hughes & Foote opened a checking account in the partnership name and at that time executed and delivered to the bank a signature card on the form provided by the bank, which authorized the disbursement and withdrawal of partnership funds from their checking account signed in the name of the partnership by either Urban B. Hughes or Alfred Foote, and that the signature card was left with the bank at the time it was executed and the account opened, and has remained in the custody of the bank continuously since that time. He further

found that Frances B. Stringer was employed by the partnership as stenographer, bookkeeper, and office clerk and was their only employee; that her duties consisted of doing general office work in the office and keeping the books of the partnership. She was to prepare checks to be drawn on the partnership account and the checks were to be presented to either Mr. Hughes or Mr. Foote for signature, and that she had no authority whatever to sign "By Frances B. Stringer". He found that she had no authority to endorse any checks for deposit. He found that the defendant bank never at any time during the period personally informed either Mr. Hughes or Mr. Foote of the fact that they were paying out and disbursing the funds on deposit to the credit of the partnership on checks signed by Frances B. Stringer, and that the bank was guilty of negligence in so doing and that Hughes & Foote are entitled to recover the amount of such checks from the defendant bank; that all of these checks bore unauthorized signatures and endorsements and that the bank was negligent in cashing the checks of McGlothlin and depositing them to the account of Frances B. Stringer. He further found that the appellees were free of any negligence in not earlier detecting the course of action being followed by Frances B. Stringer; that they were free from any negligence. He found that the five-year statute of limitations applied in this case.

The sole and decisive issue in this case is whether the bank was negligent in cashing the checks on the unauthorized signature "Hughes & Foote by Frances B. Stringer". The negligence in such matter where an employee exceeds her authority in signing checks was decided in 1933 by this Court in the case of Deer Island Fish & Oyster Co. v. First National Bank of Biloxi, 166 Miss. 162, 146 So. 116, which held: "Of course, it is quite well settled, and the general rule is, that a bank pays money upon a forged or unauthorized check at its

own peril, and if it pays from its own funds it must lose unless there are exceptional circumstances to which we will advert, and which would absolve the bank from liability * * *.

"Therefore, it was a question of fact for the jury as to whether or not the bank was negligent in paying forged checks. If the jury so found, then the defense of want of diligence on the part of the depositor would be foreclosed, and under the prevailing rule, undoubtedly correct, the bank would be liable and should suffer the loss * * *.

"* * * A depositor's failure to examine his checks within a reasonable time, according to the circumstances of his particular business, and the loss occasioned to the bank by such failure, makes the depositor liable for the amount of the checks or forgeries paid by the bank, where it is shown that the bank was not negligent * * *.

"* * * A depositor may intrust this duty to a competent, honest bookkeeper, or to an employee whom he, in good faith, believes to be honest and competent. There are authorities which hold that the action and knowledge of a dishonest employee is at once imputed to his principal. This view, in our judgment, is at war with the general rule and would operate to relieve the bank of any responsibility, and discharge it from the rigor of the rule that a bank pays out the money of its depositors on forged instruments at its peril. We cannot subscribe to this doctrine; it destroys the rule which is wholesome. It has been thought that a bank engaging in the business of depositing and paying out money on checks and other exchange is equipped to discover forgeries and to safely preserve its depositors' money * * *.

"We conclude that when a bank is free from negligence in the first instance, it becomes and is the duty of the depositor within a reasonable time to make an examination of his statement of account and cancelled checks and vouchers supporting same, or, in good faith,

to have said examination made by a competent and honest employee, who he believes to be such * * *.

"* * * In the case at bar the question of the bank's negligence vel non should be submitted to the jury, and the right of the bank to avail itself of the defense of negligence on the part of the depositor should only be accorded in the event the jury should find as a fact that the bank was not negligent * * *."

This case is in accord with the general rule. In 7 Am. Jur., Banks, Sec. 516, p. 371, it is said: "Consequently, in every case where suit is brought by a depositor to recover from a bank money deposited by him, which the bank has paid out otherwise than in conformity with his orders, and the bank sets up the defense that it is nevertheless entitled to charge the depositor with such payments because of conduct of the depositor subsequent to such payment, the preliminary question to be determined is whether the bank was or was not guilty of negligence in making the payments. If it was negligent, if its officers are found to have failed to exercise due and reasonable care in detecting the forgery or fraud, then the subsequent negligence of the depositor, his failure to perform his duty in examining his passbook and vouchers with reasonable care and to report to the bank in a reasonable time any errors or mistakes, will constitute no defense."

In First National Bank of Philadelphia v. Farrell, (C.C.A 3d), 272 Fed. 371, 16 A. L. R. 651, the appellant bank was sued for having honored checks drawn by an agent in amounts exceeding the sum for which he. was authorized to sign checks. The court, after referring to the general rule regarding examination of passbooks and the statements by a depositor, said: "But the general rule arising from the examination of pass book or statements by the depositor himself, and the variation of the rule arising from the examination of them by his authorized agent, involve in practically every reported

instance wrongdoing where the negligence of the bank was not involved and where the wrongful act was entirely that of a person other than the bank. Both the rule and its variations disappear altogether where the bank has been negligent in detecting the fraud; National Dredging Co. v. Farmers' Bank, 6 Penn. (Del.) 580, 16 L. R. A. (N.S.) 593, 130 Am. St. Rep. 158, 69 Atl. 607; Manufacturers' Nat. Bank v. Barnes, 65 Ill. 69, 72, 16 Am. Rep. 576; Myers v. Southwestern Nat. Bank, supra; when the neglect of the bank to observe the limitation of a drawing power was, as here, the primary and proximate cause of the loss; and particularly where, as here, the wrongful act (in the sense of conduct beyond the scope of its authority) was the act of the bank itself, but for which the criminal act of the trusted agent could not have been carried into execution. In honoring checks beyond the authority granted it by the depositors' power of attorney, — a document in its possession, — the bank in this case knew, or was charged with knowledge of, its own unlawful conduct. Manufacturers' Nat. Bank v. Barnes, 65 Ill. 69, 72, 16 Am. Rep. 576; Leather Mfrs.' Nat. Bank v. Morgan, supra. The depositors' failure personally to examine the periodical statements and promptly to acquaint the bank with its own wrongdoing misled the bank in nothing. Therefore the law did not impose upon depositors in this case the duty to check up a pass book or examine monthly statements to prevent the defendant bank from continuing its own wrongful conduct; nor did the law exonerate the bank from acts which it knew were wrong, simply because the depositors had not found it out and had not told it to stop.

"We are of opinion that the learned trial judge made no mistake of law in holding the bank liable for honoring checks beyond the authority which the plaintiff depositors had conferred upon it."

The appellant objected to the court applying the five-year statute of limitation and claims that the six-month statute applies and is in accordance with Chapter 185, Laws 1952, which applies to forged, altered, or raised checks. There is nothing in this case of forgery, altering or raising checks, but it is purely a question of negligence on the part of the bank to honor unauthorized checks. It would have been very simple in the first inception when Frances B. Stringer signed the first check "Hughes & Foote by Frances B. Stringer" for the bank to have notified in person either Mr. Hughes or Mr. Foote of the fact, which would have avoided and stopped the unauthorized signatures. In failing to do this, and each check that came in with such signature, the bank was certainly negligent. The duty was imposed on the bank to immediately notify either Mr. Hughes or Mr. Foote and call their personal attention to this. The record shows that if any notification was given it was given to Frances B. Stringer and not to either Mr. Hughes or Mr. Foote for their verification.

We feel that the learned chancellor was eminently correct in his findings and that the appellant was negligent, and this negligence began at the time the first check was signed by the employee and never communicated it to either of the appellees. The case is therefore affirmed.

Affirmed.

*Lee, P. J., Arrington, Rodgers* and *Jones, JJ.,* concur.