Herschel Brickell (Brickell) brought suit, in cause no. 92,140 in the Chancery Court of the First Judicial District of Hinds County, against First National Bank (FNB) for cancellation of documents executed between the parties, for recovery of all amounts he had paid to FNB by virtue of those instruments, for a money decree in the amount of $400,000, and for a certain accounting. (This suit was begun February 20, 1974).
McKey-McPhail, Incorporated, brought suit, in the Circuit Court of the Second Judicial District of Hinds County, against First National Bank (FNB) for a money judgment for $500,000. (This suit was also filed February 20, 1974). On motion it was transferred to the Chancery Court of the First Judicial District of Hinds County, where its number became 99,144.
These two suits were consolidated and were thus tried together, resulting in decree in favor of FNB. From this adverse determination, the complainants have appealed, and here assign errors as follows:
 1. The opinion and final decree of the court was against the overwhelming weight of the evidence and is manifestly wrong.
 2. The trial judge erroneously applied the law to the uncontradicted facts.
 3. The trial court erroneously placed the burden on the appellants to go forward with proof that appellants did not get benefits from money taken without authorization from the McKey-McPhail, Inc. bank account.
 4. The trial court erred in failing to rescind the $95,800 note and deed of trust after determining that the appellee purposely withheld information material to the transaction.
 5. The trial court erred in refusing to grant relief to appellant, Brickell, as guarantor, where appellee had not perfected *Page 1015 
liens on the collateral securing notes guaranteed by Brickell.
 6. The trial court erred in granting judgment for the appellee on its cross-bill.
 7. The trial court erred in granting the appellee any attorney fees.
 8. The trial court erred in allowing the appellee to cross examine Alton E. McKey as a hostile witness.
The record consisting of ten volumes and with almost a hundred exhibits is quite involved.
Brickell, apparently a very successful insurance man, but with trust and confidence in others to a fault, had a friend and college mate, Bob Heberling (Heberling). Heberling was, in the winter and spring months of 1968, factory representative of American Motors. American Motors had not enjoyed phenomenal success in the Jackson area in competition with other motor vehicle manufacturers, and in January 1968, was in search of a person for such local dealership. In their contacts, Brickell asked Heberling if he, Heberling, would like to be such dealer, and Heberling indicated in the affirmative. The two of them agreed that Brickell would provide the capital, ($25,000 in stock of a corporation to be chartered, $25,000 loaned to the corporation by him and $25,000 to be borrowed by the corporation from the Mississippi Bank Trust Company, on which Brickell was to be personally obligated, a total of $75,000), which would be sufficient working capital to begin. In addition to this financing arrangement, Brickell agreed to subrogate his $25,000 to Commercial Credit Company's floor plan loans. Brickell had two cars which he permitted the corporation to sell and to retain the proceeds therefrom. He put other money in the corporation.
The corporate charter was obtained as "Bob Heberling, Incorporated," and Heberling was manager thereof from March 1, 1968, to November 1, 1969.
About a year after the business began, after reviewing the profit and loss figures for a time, it was apparent to Brickell and Heberling that Heberling lacked management ability to operate the business at a profit. It had been understood between these friends that Heberling would buy Brickell out of the business, eventually, from its profits. There had been a loss of $32,710 on the July 31, 1969, profit and loss statement.
They seemed to agree that Heberling, with his best effort, had not been able to succeed in the business. There is found in the record no suggestion or suspicion of wrongdoing as causing this lack of progress.
Brickell, since the early sixties, had an insurance customer, one Alton E. McKey, (Gene or McKey), in whom he had confidence. McKey was for a lengthy period of time engaged in the automobile sales business in Jackson and Centreville, and Brickell, faced with the three options, selling, closing, or continuing with another manager, sought McKey's advice and guidance under the circumstances.
They met with American Motors in August 1969 and that manufacturer agreed for McKey to take over the business and operate it for a few months with the understanding that McKey would advise him, Brickell, if he saw he could not operate the business profitably.
In September 1969 they agreed, in a writing presently to be noticed, and it was understood that McKey would continue to operate his own business and assume the responsibility of the Heberling corporation, which would include his placing a person of his choice in charge of the corporation business, who, he thought, would work best under his direction with a view to a profit. McKey chose Joe McPhail (McPhail) for the place as general manager, and after two months, Heberling returned to American Motors. In February 1970 the corporate name was changed to McKey-McPhail, Incorporated (corporation) from which title it never changed. McPhail was general manager until March 1, 1971, at which time McKey moved his office to the corporation and changed McPhail's duties to that of sales manager, his title remaining the same. McPhail stayed with the corporation until about March 1, 1972. *Page 1016 
While general manager, McPhail's various duties included hiring and firing of employees, and supervising the parts department, the body shop, and the repair shop.
The Brickell-McKey agreement, entered into on the blank day of September 1969, included Brickell's granting to McKey, "an irrevocably proxy to vote all of his stock in Bob Heberling, Inc. for so long as this agreement is in full force and effect." McKey was to devote his best efforts to the management of the affairs of the corporation "for a period of one (1) year from the date hereof and as long thereafter as is mutually agreed by the parties hereto;" provision for compensation to McKey, and for option to McKey to buy Brickell out of the corporation on certain terms are not here important.
Perhaps, in effect, however, the testimony of Brickell on cross examination better describes their practical operation under the agreement. Appellants have thus abridged his testimony:
. . . I approached Gene McKey and we had a written agreement which we lived by until November of 1972. The purpose was for Gene to assume full and complete responsibility and control of the corporation and dealership operation. I was not to enter into the day by day operations of the business, the management, supervision of employees, hiring and firing, of employees. I put Gene in charge because he was president and was to appoint whomever he had elected to operate the business. I gave him voting rights to all the corporate stock because that was a requirement of the Associate's Financial Corporation and their agreeing to grant the floor plan. I assumed that I had sold him the business, but our agreement really was that he would take it over and run it for a period of time and if he saw he could not make a profit, he would tell me; I would take it back over and exercise one or two of the other options that I had. The agreement was made at a time when the business had a negative net worth from a capital stock standpoint. . . . When I contacted Gene McKey I knew the business was running at an operating loss. Under the arrangement I had with Gene McKey customers, employees, creditors and banks were to deal with McKey rather than me.
The corporation was buying and selling used cars as a part of its business. Gene McKey's south Jackson business where he stayed until March 1, 1971, was dealing with used cars; the Centreville business operated by McKey and his brother, was in the like business. Each of these businesses had naturally to replenish its supply of used cars on an often recurring schedule. McPhail did a part or much of this buying at the used car markets and the record supports the conclusion that his enthusiasm frequently dethroned his better judgment and he bought beyond the financial ability of those for whom he was buying.
McKey had certain of his business property insured with Brickell. Practical difficulty was being experienced in handling separately the corporation's inventory and purchases and sales and those of McKey, both at Jackson and Centreville. To obviate this confusion and difficulty, McKey's Used Car Lot became consolidated or merged (as frequently described) with that of the corporation, about July 1, 1971. The decision Brickell testified was made simply to run all automobile sales through one set of books, a plan to which he did not disagree for McKey had represented to him that McKey's used car operation had been profitable and that he would pull the profit over to the corporation and Brickell would get his money more quickly and be out. On the date of the consolidation, two of McKey's employees, Ronnie Hux and James Thompson, went on the regular corporation payroll. On July 1, 1971, the bookkeeper began posting on the corporation's general books cars sold on McKey's lot. The consolidation was not discussed in detail (characteristic of Brickell's ill-fated entrance into, and connection with, the motor vehicle business), his understanding being that, from July 1, 1971, forward, all of the business activity of the two locations would be conducted as *Page 1017 
though it were the corporation operation. No discussion was had as to what assets or liabilities were going to be put into the corporation from McKey, Brickell not assuming that more liability than assets would be brought in.
The corporation paid McKey's Motors liabilities and its monthly operating expenses; there were transferred possibly $12,800 worth of vehicles; the corporation maintained an accounts receivable ledger card for Gene McKey Motors at Jackson and for the operation at Centreville.
Further complicating the operation, McKey had a mini-bike sales business and brought his inventory to the corporation floor. Still further confusing the details was the operation, by McPhail, of a car renting business (Rebel Rent-a-Car), not necessarily badly intermingled with the corporation's inventory, but in existence nevertheless, and use of title, McKey American, at intervals. The corporation as a sales attraction would give one of the mini-bikes to a purchaser of a new car from the inventory.
It was a part of Brickell's written agreement with McKey that:
 6. It is contemplated that monthly operating statements will be prepared . . .
These statements reflecting profit and loss, and such statements were required by American Motors and probably by the floor plan lender. Several bookkeeping procedures were tried, finally resulting in a contract with an accounting firm to do all the bookkeeping and accounting, the firm keeping on its payroll a person at the corporation offices to do this work. Beginning March 1, 1971, this accountant was Mrs. Ruth Allen, who, on July 1, 1971, went on the corporation payroll as bookkeeper and who remained until the corporate business submerged, and then went on Brickell's own insurance business payroll. When she became a corporation employee, she answered to McKey.
As was true in Heberling's tenure, the corporation experienced hard financial times. These profit and loss statements had either usually to show losses or had to be so constructed and finances so handled that they could show a profit (carrying an employee payroll late in the month over to the next month was one way it was accomplished.) Mrs. Allen prepared these as instructed by McKey, according to her testimony.
She testified that she did what McKey told her to do. "I had to do some moving around of figures on the statements we sent each month to American Motors. I would carry over some expenses to the next month so that I wouldn't have to put them on the current monthly statement so it wouldn't look so bad. I did not manipulate the records to the extent that I turned a loss into a profit, I didn't consistently send reports to American Motors showing a false profit. I wouldn't do that unless I was told to do it. . . ."
Important as will appear later herein was her testimony as abstracted:
 Mr. Brickell might have called me a time or two and told me he was coming down to get the used car inventory for insurance purposes. I don't know that he did. He did have the insurance on the used cars. My job was to reconcile the bank statements each month at McKey-McPhail. I had personal ledger cards down there for employees to note debts to the company. The business was too much in the red when I went down there in early 1971. There were too many notes and little profit. While I was there the financial condition got progressively worse. I was amazed that the owner did not close the place up in 1971.
The veracity or honesty of Mrs. Allen is nowhere attacked in the record.
Brickell frequently went to the corporation offices. The records reflecting the financial status of the corporation, including the FNB statements, were inspected by him or were there for his inspection.
The manager of FNB Westland Plaza Branch, Mr. Jimmy Means, was a good business and social friend of McKey. They bought and sold realty together (along with *Page 1018 
others in some of the transactions) and he helped McKey out of some financial difficulties by becoming surety or guarantor for him at a bank in Natchez. FNB did much of the corporation's banking, although other banks figured to some extent in its operations. Much is made of the patronage of the corporation with FNB without a requirement that the corporation adopt a resolution to use FNB as its bank, and that the corporation provide signature cards for those dealing with the account and failure of the bank to honor only transactions by designated signatories.
The corporate minutes show that, on March 1, 1968, a resolution was adopted that a bank account be opened with Mississippi Bank 
Trust Co. at Jackson, but the minutes reflect no such action as to FNB. There are in the record, however, a copy of a purported certified copy of a resolution of the corporation establishing a bank account with FNB, but not naming any persons authorized to sign checks thereon, and another copy authorizing the borrowing of money from FNB, signatures of McKey and McPhail on a signature card, a dealer's agreement with FNB, a letter by McKey dated September 29, 1971, advising FNB that effective that day McKey, McPhail and Ronald C. Hux were authorized to sign the FNB automobile contracts of the corporation and picture of a signature card containing the authorized signatures of McPhail, Mrs. Ruth Allen, and McKey, dated August 9, 1971.
The record reflects familiarity of Brickell with some business transactions with FNB, for he signed a continuing guaranty to FNB for the corporation. We do not understand that he claimed no familiarity, but his complaint is that McKey and FNB operated without authority on the corporation's minutes, and that it operated in disregard of the certified copy it did have.
Brickell testified that the first time he knew that the corporation was in serious financial condition was when the September 1971 year end report by Palmer and Chapman (the auditing firm) was delivered to him late in August or early in September 1972, which showed a loss of $22,339 during the fiscal year 10/1/70 to 9/30/71, whereas the internally produced profit and loss statements reflected a profit of $21,049 for that period. He called for a pencil trial balance, which the auditing firm prepared for him which showed an even larger loss. McKey was given a few days in which to buy Brickell out, and when he failed to do so, Brickell, took over the corporation and on November 9, 1972, began what ended in a liquidation of its assets, on which $149,861.55 was realized. By the time of his taking over the business, he had been told that the loss was $250,000.
As to Brickell's awareness of the adverse financial condition of the corporation, he testified:
 I went down to McKey-McPhail to buy gasoline, to have the car serviced, and visit with Gene about how things were progressing. I was not aware that the company was losing money. An audit for one year shows a $2,000 operating profit but a continued deficit for the preceding year. The business was losing money the whole time, but I was not aware of it. First National Bank had nothing to do with the internal profit and loss statements. The internal profit and loss statements prepared by the corporation were required by American Motors.
 I did not look at the bank statements, and I was not aware of the fact that the corporation was losing money after McKey took it over, until I got the fiscal year end report from Palmer for 9/30/71 which was delivered in late August or early September, 1972. I did not look at any of the McKey-McPhail bank statements, review any of the general books, direct any of the employees in the bookkeeping department what to do, and didn't go to the office and ask to review the records. Gene McKey would have the primary responsibility and may have delegated some of that to Joe McPhail and Ruth Allen, to verify charges against the bank account within a reasonable time after those charges were made. Since November of 1972 I have reviewed the *Page 1019 
bank's statements. There are debit memos in the statements. I assumed the debit memos were put in the statements the same as a cancelled check would be included. The bank statements were going to the office of McKey-McPhail, not to me. If I had reviewed the bank statements, I would have known about each debit. The statements were not hidden from me. I never asked for them because it never occurred to me that the First National Bank would conduct their business affairs in the manner that they did. I gave Gene McKey the duty to review bank statements and I assumed that First National Bank was using ordinary care in conducting the bank account of the corporation in accordance with normal banking procedures. I had no reason to question that.
 I am critical of the debits. The only debit charged against my Brickell Insurance corporate bank account would be where the bank was reversing a customer's check for insufficient funds.
 I would think that under normal procedures the bank requires that their customers come and pick up drafts with cash or with a check signed by someone authorized to sign on the account. If the bank and McKey chose to do it over the telephone, and if in fact the drafts were drawn to purchase cars, and if in fact the cars went to McKey-McPhail, I still have some complaint with that procedure. Suppose they mailed a draft with the title papers in it, and it never reached the dealership and the account had been charged for the money and the dealership didn't get an asset for it, i.e., didn't get the title documents they need to sell the car. I assume that in each instance if a debit were issued for a draft, that debit appeared in the next bank statement sent to McKey-McPhail.
 Drafts were being held beyond that time the bank permanent collection records indicated the due date to be. The use of that procedure was a part of many of the other things the bank did, permitting the people who were there to continue to defraud the corporation. It allowed them to keep operating, certainly to my detriment, and if that assisted them in continuing the operation of the business, then that did serve to be disadvantageous to me. As far as the overall conduct on the part of the bank, they permitted the employees there to continue to operate the business and continue to further defraud it.
There had been innumerable transactions between the corporation and FNB, and the corporation's account there had been in an overdrawn condition almost steadily for months. Deposits, checks, drafts, car sales contracts, and car rental contracts had been part of the order of business.
Some checks were drawn on the account and many drafts were processed. The record is sufficient on which to base the conclusion that, in the wide territory of buying used cars, the use of checks is impractical, and the practice employed in that industry is to use drafts, envelope type, in which the payee of the draft would place the title evidence documents. The draft is then sent to a bank which collects from the drawer or the payor the amount thereof and the draft and legal documents therein are delivered to drawer or payor.
This procedure became a standing one between the corporation and FNB. When a draft arrived at Westland Plaza Branch, the manager or his assistant would call the corporation and relay information that the draft was there, and the responsible person at the corporation would, by telephone, approve payment of it, whereupon a debit slip would be prepared and the amount of the draft would be debited to the corporation's account. Then, usually, but not without exception, the draft and contents, if any, were mailed to the corporation and the debit slip would be included in the bank statement for that month. There came the time when there would be no checks at all in a statement, all the charges there against being on debit slips. These statements and their supporting debit documents were audited and reconciled by Mrs. Allen, as mentioned above, but she did not see every draft on which the debit slip would be made up. *Page 1020 
As a part of the debacle surrounding Brickell's taking over of the business, FNB promptly became concerned with the status of the corporation finances with it, and conferences were had between the parties. Brickell wanted a clearer picture of the situation with FNB, and FNB put one of its employees, Ernest Knight, to the task of preparing a study and report thereon.
In the meantime, FNB's attorney was urging an early stabilizing of the financial situation, and Brickell, whether clearly threatened with suit or not, but believing (from his attorney), that he was in danger of being sued, which, with his standing with the insurance companies, he did not consider he could afford, arrived at an agreement with FNB which was intended to clarify his own standing and that of the corporation. Thus, without the benefit of Knight's study, frequently referred to as the "Knight Report", Brickell on March 30, 1973, for the corporation and for himself, entered into contracts with FNB and, acknowledging an indebtedness of the corporation on which he was liable, he executed an installment promissory note to FNB for $95,800, and gave a deed of trust to secure its payment.
In the corporation's agreement, it acknowledged the justice of notes for $58,000, $16,000 and other notes, disagreed and left to be resolved certain other matters which FNB contended were due from it, and admitted therein that it had a "present and unconditional liability of $126,876.75, all of which is due and payable," and a contingent liability of $6,950.24, explained in the agreement.
Brickell's agreement, leaving some issues for future settlement, admitted that his present "personal and individual liability is $95,800." FNB with the exception of items identified and unresolved,
 (a) Acknowledge[s] and agree[s] that it has no claims whatsoever against Brickell personally or individually for payment of any other obligation of McKey-McPhail to FNB; and
 (b) release[s] and discharge[s] Brickell from any and all claims, demands, damages, and causes of action of every kind and nature whatsoever which FNB may have or claim to have as a result of or arising out of any transactions occurring prior to the date hereof.
The record is not conclusive as to whether Brickell and his attorneys made demand or urged, on March 30, 1973, or in earlier similar meetings, for the Knight report. The record will bear the opinion that it was at least casually mentioned at that or an earlier meeting, and a non-committal answer was given as to whether it was in FNB's officers' possession then. The record is also unclear as to the fact or not of its completion at that time, Knight's testimony being that it was earlier placed in FNB's attorney's possession.
Nevertheless, soon after the March 30, 1973, meeting and transactions set forth above, the report was released, and contained information as to how the corporation's business had been handled with FNB, which was disturbing to Brickell. It is our view that, except in specific details, it reflected the situation to be about what Brickell had learned, with the capable aid of Mrs. Allen. Whether with its contents in his knowledge he would have done the same in the March 30, 1973, meeting that he did without it allows speculation in which we may not indulge. It is significant we think, that with the report in his hands, he paid the first installment on his $95,800 note to FNB, which became due on May 1, 1973, and thereafter paid every monthly installment that accrued through 1975. He explained his doing so, "I had signed a note, and I felt I had an obligation to fulfill my responsibilities, even if the other party was not going to. During the two years I made monthly payments on the note, I continued to be represented by Butler, Snow . . ."
One of a number of suits the corporation filed was against Travelers Indemnity Company to recover for infidelity of certain of the corporation's employees. It was filed in the federal court and was settled for $50,000. In the maze of pleadings in that case, FNB was made a party and filed a pleading, *Page 1021 
demanding recovery against Brickell in some event. Brickell said: "My last payment on the note was made on December 30, 1975. I stopped paying on the note at that time because in the federal court case where they had been joined as parties and I had been joined as a party they filed a cross bill against me which I felt was a direct violation of the terms of our agreement. The agreement released me from anything I owed them for occurrences prior to March 30, 1973. The cross bill was in violation of that agreement. I have not made any payments since then."
As hereinabove related, Brickell individually and the corporation wholly owned by him sued FNB early in 1974. Although Brickell's suit was for cancellation of the March 30, 1973, transactions, which included the promissory note, he continued to keep the installments up for almost two years, and has not pleaded, as a reason for cancellation thereof, that FNB had sought an amount in federal court, contrary, as he viewed it, to the March 30, 1973, contract contemporaneous with the note.
In the two suits, being considered on appeal in their consolidated form, to which answers and cross bills were filed, and amendments were freely permitted, it is alleged that without corporate record authority, McKey opened the FNB account, but, acting under corporate resolution, signature card was given FNB, under which McKey, McPhail and Mrs. Allen were the only persons authorized to withdraw money from the account, and then only by check of the corporation signed by one of these signatories. Many allegations of wrongdoing were set out in the bills of complaint, including:
 (a) paying checks drawn on the account of others out of the dealership account;
 (b) paying sight drafts through the dealership account by the technique of debiting the dealership account;
 (c) paying checks and drafts signed by individuals purportedly on behalf of the dealership when the individuals were not authorized to sign such checks or drafts and debiting the checks or drafts to the account of the dealership;
 (d) permitting the dealership to engage in kiting operating;
 (e) debiting the dealership's account on behalf of F.N.B. for debts allegedly due it without proper authority or any authority whatsoever;
 (f) charging and debiting to the dealership account the principal and interest of loans made by it to third parties;
 (g) cashing checks payable to the dealership on the signature of individuals in no way authorized to sign checks for the dealership and giving proceeds of such checks to the individuals;
 (h) double financing vehicles without requiring the first note, for which the vehicle was given as security on note obligations of the dealership to be paid;
 (i) cashing checks representing loan proceeds due the dealership for individuals and not requiring such funds to be deposited to the dealership account;
 (j) permitting the proceeds of loans made by the installment loan department to third parties, the proceeds of which loans were to have been directed to the dealership, to be deposited to the account of McKey;
 (k) making loans on and taking as security therefor vehicles without receiving proper title certificate or evidence of title;
 (l) fraudulently issuing a cash deposit slip on September 30, 1971, indicating a $13,500 cash deposit when in fact no such deposit was made;
 (m) regularly debiting the McKey-McPhail account for debts due by third parties to F.N.B.;
 (n) arbitrarily transferring $5,000 from the dealership account to the account of Gene McKey Motors without authority on September 25, 1970.
They further allege that many of the transactions were handled by branch manager James H. Means, shown hereinabove to be a personal and business friend of McKey, and that these transactions were for McKey's benefit, known to the manager to be detrimental to the corporation. *Page 1022 
Brickell asserts that FNB knew he was the corporation's only stockholder and that he was requested to consolidate all of his alleged obligations to FNB resulting from his personal guaranties or as an endorser of corporate notes, and on March 30, 1973, when FNB knew the account had been improperly handled, FNB required the transactions above noticed, all being procured by fraud or mistake based upon statements made by FNB and relied upon by him.
The corporation prayed that FNB be required to restore to the account all funds improperly debited and for a money decree in the sum of $500,000. Brickell individually prayed nullification of the March 30, 1973, instruments and for money decree for $400,000.
FNB admitted some of the wrongful acts, denying that the branch manager had FNB authority to do so and was beyond the scope of his authority. It denied wrongdoing or deceit in the March 30, 1973, transaction and denied knowledge of the manner of handling of the account and of the various dealings complained of. FNB pleaded lack of privity of relationship with Brickell except through his personal guaranties, notes and deed of trust. It also pleaded estoppel as to Brickell and the corporation because of the proxy to McKey to vote all the corporate stock and the power and authority Brickell gave to McKey to manage the corporation; that McKey chose, authorized, and directed the dealings with FNB; and that the respective complainants failed to notify FNB of any alleged unauthorized charge, signature, or alteration as provided by Mississippi Code Annotated, Section 75-4-406 (1972). FNB pleaded affirmatively further that if McKey was acting beyond the scope of his authority and criminally, the same was true of FNB's branch manager, and they were particeps criminis, and the bank was not responsible for their pari delicto acts.
FNB made its answers, cross bills against both complainants praying from the corporation $154,679.60 and from Brickell $89,345.95, both figures being plus interest and reasonable attorney fees.
In addition to the suits noticed (these two and that against Travelers Indemnity Company), Brickell and/or the corporation sued the corporation's accounting firm and recovered by settlement $100,000 and sued McKey, Hux and McPhail, and perhaps others. McKey went into bankruptcy.
On May 15, 1978, final decree was entered granting the cross bills of FNB, with money decree for $125,207.34 plus interest, against the corporation, and $97.277.76 plus interest against Brickell, which figure included a contested attorney fee of $7,613. The original bills were dismissed.
It seemed to be conceded in the record that the dealings between the corporation and FNB were "sloppy", as will presently be further noticed. Before doing so, it is proper to observe that the operation of the business, independently of the relationship with FNB, was equally sloppy. This conclusion is reached by narration hereinabove, if no other facts and transactions existed.
While probably affording a likely outlet for profitable use of Brickell's funds, the corporation was one that required capital and was operating on what was for it "shoe string" financing, as overwhelmingly established in the record. In addition, Brickell sole stockholder who had substantial amounts in stock and loan gave to McKey unlimited authority in the management of the business and he used that power with the result that the corporation was destroyed. Confusion could but prevail under the circumstances of this record.
Turning to FNB, Brickell complains that branch manager Means extended to the corporation financial favors which kept it in operation, when, to protect the corporation against itself, he should have refused such injections in the corporate finances, and let it fail. The branch manager, hard pressed to say he was helping his friend McKey, repeatedly affirmed that he was doing it for McKey and the corporation, as a help to them.
It is true that charges were made against the corporate account in favor of individual employees of the corporation. There is undisputed *Page 1023 
proof that the corporation's bookkeeping department had ledger sheets on these beneficiaries and there is no showing that the corporation lost anything on their account.
Used cars were bought in a group for the corporation, and the Centreville operation, financed as far as the seller was concerned, by the issuance of one draft, and the corporation's bookkeeping had to charge against the Centreville operation a proper charge. There is no showing that in the intricacy of it all the corporation lost anything.
The corporate finances got so bad on occasions when "money floating" had to be resorted to, but there is no showing that the corporation lost any money to FNB because of the branch manager's aid in that respect.
Checks were issued; others were indorsed, without proper signature. These were handled by FNB with McKey's approval. Whether he or another approved the payment of the drafts, in almost a half-million dollars, these and their manner of handling were with McKey's approval. In all these things he had authority, for Brickell's testimony can be interpreted no other way. (Some were checks, some were drafts. Section 75-3-104).
He, in effect, told FNB to handle it according to McKey's steering, and now says the bank should not have so done. For purposes of the business, McKey was the corporation; when taken back by Brickell then he, the corporation, complains that FNB did as the corporation had wished.
Mississippi Code Annotated, Section 75-4-401 (1972), says:
 (1) As against its customer, a bank may charge against his account any item which is otherwise properly payable from that account even though the charge creates an overdraft.
Section 75-3-404 provides:
 (2) Any unauthorized signature may be ratified for all purposes of this chapter . . . (UCC Commercial paper).
It is complained that there is no resolution in the corporation minute book authorizing the opening of this account, and an inspection of the minutes in evidence supports this argument. A copy of a resolution to that effect was apparently certified by McPhail and lodged with FNB. The acceptance of deposits without the resolution may be regarded as risky and something against which caution cries out. The same to a greater degree may be said of charging checks with unauthorized signatures and the payment of (or holding for days without debiting the account for) drafts. We view these activities as not evidencing the soundest of judgment, and in case of loss by the corporation a loss that would necessarily pass to the neglectful bank.
The ultimate decision rests upon the inquiry as to whether the corporation has lost through the bank's activity and, if a loss, how much? To reach that decision a determination has to be made as to whether the corporation must prove a loss or the bank must prove that there was no loss to the corporation. Appellants take the latter position and cite authority for it. The reverse, with authority, is asserted by appellee. If appellants are correct then, if FNB could not bear its impossible burden, it could suffer decree against it for nearly $500,000, while the corporation had no loss at all, for aught appearing in the record in such case.
In support of their position appellants rely on several decisions from other jurisdictions, and Deer Island Fish andOyster Co. v. FNB of Biloxi, 166 Miss. 162, 146 So. 116 (1933), and Commercial National Bank and Trust Co. v. Hughes, 243 Miss. 252, 137 So.2d 800 (1962).
In the Deer Island Fish Oyster Co. case, forgery by an employee of the plaintiff-appellant was the basis of the action. In its decision, this Court said in part:
 The burden of proof was on the plaintiff in the court below to establish, by a preponderance of the evidence, the material allegations of the declaration, and to show that the bank was actually indebted to it in some sum; and it will not do to say that the mere proof that the complaining party was a depositor in the bank, showed or tended to show the state *Page 1024 
of accounts between the parties at the date the suit was instituted. (Emphasis added). (166 Miss. at 169, 146 So. at 117).
In the Hughes case, supra, there was involved only the issue of negligence on the appellant bank's part in honoring unauthorized checks. The employee of appellees who wrote and signed checks and endorsed others over a period of years, was never at any time, authorized to sign or endorse checks and she was never permitted to sign the signature card of the bank for the purpose of signing checks. No check she ever signed or endorsed was turned down by the bank or called to the attention of her employers. When her extra-duty activities became known to her employers, they took immediate action thereon. On the facts, the case is so widely different as to constitute no authority helpful in the present consideration.
Appellees assert that the burden was on appellants to show that the bank's criticized activity caused a loss to appellants in the absence of which there could be no recovery. FNB cites two of our decisions in support of its position: Anthony Bros. v. Bank ofSebastopol, 151 Miss. 373, 118 So. 198 (1928); and N.O. NelsonCompany v. Deposit Guaranty Bank and Trust Co., 228 Miss. 853,89 So.2d 854 (1956).
In the first of these cases, the Anthony Brothers decision, appellants, dealers in cotton, on instructions drew a draft on a supposed purchaser, and deposited it in appellee bank. It sent the draft to its correspondent bank which sent it to another bank for presentation and collection. The draft, after an inordinate length of time, was returned to appellee bank and appellant Anthony Brothers had to reimburse the appellee the amount it had deposited to their credit on the strength of the draft. Appellant sued all three banks involved, and from an adverse decision in the lower court appealed. The Supreme Court in affirming the case, said:
 It is settled law that a bank receiving a note, draft, or other commercial paper is bound to use reasonable diligence and skill in handling the paper, and that it is liable for negligence in failing to handle the same in a proper manner (citing authorities). But it is also settled that the plaintiff must aver and prove his damages, and that he must be damaged in fact by the transaction.
(citing authorities) (Emphasis supplied).
 (151 Miss. at 381, 118 So. at 199).
In the second of these cases, N.O. Nelson Company v. DepositGuaranty Bank Trust Co., appellant arranged with a bank later becoming a part of appellee, whereby appellant would deposit monies from its Jackson, Mississippi, business in said bank, which could only be withdrawn therefrom on the signature of designated persons and then only for the purpose of transferring funds to a bank in Memphis, Tennessee. Deposit slips covering local daily sales were prepared and deposits were made to appellant's account. Checks accompanying the deposit slips were stamp-endorsed, "For deposit only, pay to order of Commercial Bank Trust Company, Jackson, Miss., N.O. Nelson Co., Memphis, Tenn." Many of the deposit slips showed "less" various sums, small to substantial in amount. The bank teller deducted and gave to the store employee bringing the deposit the amount that was to be withheld from deposit, and the employee carried the sum back to the place of business putting it with the company's funds there.
This practice extended over a period of nearly three years and the withheld amounts ran to upward of $2,700. Copies of the deposit slips and sales reports were sent daily to appellant's Memphis accounting office with never an objection by appellant to the manner of depositing and deducting therefrom.
Because of an apparent loss caused by a defaulting employee, appellant sued appellee for the deductions over the nearly three years. Unsuccessful in the county and chancery court, the case was appealed to this Court where the lower court was affirmed by opinion saying in part:
 The trier of the facts was fully justified from the evidence to find that appellant sustained no loss from anything the *Page 1025 
bank did in receiving the deposits and permitting the deductions therefrom. The proof showed that the money thus deducted was returned to appellant's cash fund. We do not find it necessary to consider whether the bank breached the deposit agreement, or whether, if it did breach the agreement, the appellant acquiesced therein and is estopped to complain. The appellant failed to prove it sustained any loss, and that alone is sufficient to require an affirmance of the judgment. (Emphasis supplied).
 (228 Miss. at 859-860, 89 So.2d at 855).
Appellants say as to the Anthony and N.O. Nelson cases,supra, that "neither case discussed burden of proof and in both cases that it is apparent that the evidence produced in the trial court clearly showed that there were no damages accruing to the plaintiff." Anthony Bros. did not involve a breach of a deposit agreement. In N.O. Nelson Company, the Court found that the proof showed that the depositor did not suffer a loss. Nomention was made as to who made that proof.
We have examined the original appeal records in these cases. In the Anthony Case (No. 27,038) in addition to the part of the opinion quoted hereinabove that states that the plaintiff mustaver and prove his damage, the appeal record reveals that, at the conclusion of the Anthony Brothers case, both sides rested. Hence this Court was necessarily placing the burden on the complaining parties, and then finding they had not established their damages.
In the N.O. Nelson case (No. 40,238) the defendant bank did not know what happened to the deducted amounts after the Nelson employee left the bank, and appellant argued on the appeal, as in the present case, that the bank's duty was to prove that the depositor received the benefit thereof. As pointed out above, this Court held it was the depositor's duty to show a loss by the bank's action.
We hold that it was appellant's burden to show loss by FNB's course of action, and that it failed to do so.
We examine the March 30, 1973, transactions at this point. Brickell was concerned about the muddled condition of the corporation's affairs with FNB. FNB put Knight, one of its employees, on the assignment of making up an understandable accounting of the transactions. As hereinabove pointed out, the report may or may not have been finished and lodged with FNB before March 30, 1973. The record sufficiently establishes that Brickell asked about it, but the officers' failure to produce it for the examination of Brickell and his attorneys and accountants was not sufficient that it caused Brickell to refuse to sign the note and contract documents on that date. Likewise, when it did reach him before the first monthly installment became due, its contents did not cause him to miss a single monthly payment until the end of 1975, much more than two years later. It has also been earlier herein observed that Brickell knew or had access to much, if not all, of what Knight incorporated in the report, and he was not, or should not have been, greatly enlightened by its content.
While we have before us no Mississippi decision directly bearing upon the effect of Brickell's repeated payments of installments on the note with full knowledge of the facts, we repeated, in Citizens National Bank v. Waltman, 344 So.2d 725
(Miss. 1977), the long-existing law that the renewal of a note with full knowledge of the facts constituting a defense to the note being renewed constitutes a waiver of that defense. We can see no logical reason not to hold that the same principle applies in a situation such as here, where the maker of the note makes monthly payments on it for upward of two and a half years with full knowledge of the facts which Brickell now claims as a defense against the debt.
The Knight report is a stupendous compilation, broken down into drafts, commercial loans, installment loans, and miscellaneous. It shows that during the period under study and from the records examined, the corporation account was debited with approximately $458,300 in approximately 196 drafts. He explained the procedure in handling *Page 1026 
and debiting them much as hereinbefore set out. There were commercial loans, 63 in number, totaling a sum of $28,356, charged against the deposit account, including eight loans to the corporation and amounting to $6,308.65. Installment loans charged were $22,230. Taking away the loans to the corporation, these were a total of $44,278. In miscellaneous was included the "floating" operation, which involved the switching of monies from one bank to another, in what was an apparent effort to avert being submerged.
McKey with his far-reaching authority, handled the drafts situation in conformity with that authority. There is no showing that, by employee ledger cards and otherwise, any amount charged in the $44,278 figure was not repaid to the corporation. The record fails to show any loss to the corporation from any of the facts and figures appearing in the Knight report.
The March 30, 1973, note was a part of a group of agreements arrived at between FNB on the one side and the corporation or Brickell on the other. Brickell, in his agreement, companion to the note, acknowledged personal and individual liability to FNB for $95,800, the principal of the note. In his agreement there were specifically left for future decision certain questions of his indebtedness, but, except as to those, FNB on its part, acknowledged and agreed that it had no further claims against him for payment of any other obligation of the corporation to it, and released and discharged him from any claims, demands, damages, and causes of action arising out of any transactions prior to the date thereof. With exceptions stated in the corporation's agreement with FNB, concurrent with Brickell's contract and note, the corporation acknowledged, "present and unconditional liability" in the amount of $126,867.75 all then due and payable and a contingent liability of $6,950.24.
As earlier herein noted, the corporation filed a suit against Travelers Indemnity Company on a fidelity bond in federal court and in the multitude of pleadings therein, found itself filing a cross bill against FNB, and, having been thus sued, FNB filed a cross claim against Brickell, a third party defendant and co-party to recover from him "such sums, if any, that may be adjudged against" FNB in favor of the corporation or Travelers Indemnity Company. The suit ended in no judgment against FNB. Thereupon, Brickell ceased his faithful payments on the note, and contends that FNB breached its contract with him; that all parts of the transaction are to be taken and construed together, and, in doing so, he maintained he was released from the note and deed of trust securing it. The chancellor did not agree with this contention, and we agree with the chancellor. The chancellor reluctantly allowed an attorney fee on the note. It is to be recalled that Brickell's suit was to annul the note and for damages and FNB used attorneys in defense of the suit, and by cross bill, sought money decree for the note and interest and for attorney's fees, as provided by the note. The chancellor deliberated at length on the allowance of an attorney fee, but we think it was warranted.
In sum, we are of the opinion that the lower court correctly denied relief to the complainants and correctly allowed the relief it allowed on FNB's cross bills; and that its disposition of the cases is supported by the weight of the evidence and should be affirmed.
AFFIRMED.
PATTERSON, C.J., SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, BROOM and LEE, JJ., concur.
BOWLING, J., took no part. *Page 1027